REVISED MARCH 28, 2014

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2014

Lyle W. Cayce
Clerk

No. 13-51008

PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES; PLANNED PARENTHOOD CENTER FOR CHOICE; PLANNED PARENTHOOD SEXUAL HEALTHCARE SERVICES; WHOLE WOMAN'S HEALTH; AUSTIN WOMEN'S HEALTH CENTER; KILLEEN WOMEN'S HEALTH CENTER; SOUTHWESTERN WOMEN'S SURGERY CENTER; WEST SIDE CLINIC, INCORPORATED; ROUTH STREET WOMEN'S CLINIC; HOUSTON WOMEN'S CLINIC, each on behalf of itself, its patients and physicians; ALAN BRAID, M.D.; LAMAR ROBINSON, M.D.; PAMELA J. RICHTER, D.o., each on behalf of themselves and their patients; PLANNED PARENTHOOD WOMEN'S HEALTH CENTER,

                          Plaintiffs - Appellees

v.

ATTORNEY GENERAL GREGORY ABBOTT; DAVID LAKEY, M.D.; MARI ROBINSON, Executive Director of the Texas Medical Board,

                          Defendants - Appellants

Appeal from the United States District Court
for the Western District of Texas

Before JONES, ELROD, and HAYNES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Planned Parenthood of Greater Texas Surgical Health Services and other abortion facilities and three physicians (collectively "Planned Parenthood") sued the Attorney General of Texas and other individuals

No.  13-51008

(collectively "the State"), seeking to enforce their rights and those of patients for declaratory judgment and to enjoin two provisions of 2013 Texas House Bill No. 2 ("H.B. 2") pertaining to the regulation of surgical abortions and abortion–inducing drugs.[1]  The district court held that parts of both provisions were unconstitutional and granted, in substantial part, the requested injunctive relief.  A motions panel of this court granted a stay pending appeal, and the Supreme Court upheld the stay.  We conclude that both of the challenged provisions are constitutional and therefore reverse and render judgment, with one exception, for the State.

## I.     Background

Passed on July 12, 2013, H.B. 2 contains two provisions that Planned Parenthood contends are unconstitutional.  The first requires that a physician performing or inducing an abortion have admitting privileges on the date of the abortion at a hospital no more than thirty miles from the location where the abortion is provided.[2]  The second mandates that the administration of abortion–inducing drugs comply with the protocol authorized by the Food and Drug Administration (FDA), with limited exceptions.[3]  We follow the parties in referring to drug–induced abortions, as distinguished from surgical abortions, as "medication abortions."[4]

---

[1] Act of July 12, 2013, 83rd Leg., 2d C.S., ch. 1, §§ 1-12, 2013 Tex. Sess. Law Serv. 4795-802 (West) (codified at TEX. HEALTH & SAFETY CODE §§ 171.0031, 171.041-048, 171.061-064, & amending § 245.010.011; TEX. OCC. CODE amending §§ 164.052 & 164.055).

[2] TEX. HEALTH & SAFETY CODE § 171.0031(a)(1).  Section 171.0031(b) criminalizes a physician's failure to comply with Section 171.0031(a)(1).

[3] *Id.* § 171.063(a); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 905 (W.D. Tex. 2013).

[4] Along with Texas, five other states have recently passed laws substantially similar to the provisions at issue here, which have also been challenged in federal courts. In each of these cases, the district court enjoined all or part of the law pending trial on the merits. *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416 (S.D. Miss. 2013) (admitting privileges); *Planned Parenthood Se., Inc. v. Bentley*, 951 F.Supp.2d 1280 (M.D. Ala. 2013) (admitting privileges); *MBK Mgmt. Corp. v. Burdick*, 954 F. Supp. 2d 900 (D. N.D. 2013)

No. 13-51008

Planned Parenthood presented four grounds to the district court for invalidating the hospital admitting privileges requirement: violation of patients' substantive due process rights, violation of physicians' procedural due process rights, unlawful delegation of authority to hospitals, and vagueness. As to the medication abortion regulation, Planned Parenthood argued that it also violated patients' substantive due process rights and was unconstitutionally vague. Faced with a pleading filed only days before H.B. 2 was to become effective, the district court consolidated the preliminary injunction and merits hearings. Waiving a jury trial, the parties consented to a bench proceeding in which Planned Parenthood presented a few witnesses and both sides offered numerous affidavits. On October 28, 2013, five days after the conclusion of the trial, the district court issued an opinion that would permanently enjoin the admitting–privileges provision and partially enjoin the medication abortion regulation.

The State noted its appeal and moved for an emergency stay of the district court's order. Within forty-eight hours, on October 31, this court responded to the parties' briefing and held that the State made a substantial showing of its likelihood of success on the merits of the admitting privileges

(admitting privileges); *Planned Parenthood of Wis., Inc. v. Van Hollen*, No. 13–CV–465–WMC, 2013 WL 3989238 (W.D. Wis. Aug. 2, 2013) (admitting privileges); *Planned Parenthood Sw. Ohio Region v. DeWine*, No. 1:04-CV-493; 2011 WL 9158009 (S.D. Ohio May 23, 2011) (medication abortion). Four of these cases—*Bentley, Burdick, Van Hollen*, and *DeWine*—are pending before the district court. The Seventh Circuit issued an extensive opinion affirming the preliminary injunction in *Van Hollen. Parenthood of Wisconsin, Inc. v. Van Hollen,* 738 F.3d 786 (7th Cir. 2013), discussed *infra.* Additionally, the Sixth Circuit affirmed summary judgment for the State in *DeWine* on three of the four claims, though the issue of whether the State's regulation of medication abortion burdens a woman's right to health and life under the Fourteenth Amendment has been held for trial. *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir. 2012). The preliminary injunction entered by the district court in *Currier* has been stayed pending its appeal before this court. *Jackson Women's Health Org. v. Currier,* No. 13-60599, (5th Cir., filed Aug. 27, 2013).

3

No. 13-51008

requirement, and that it demonstrated likely success as to part of the district court's hand–crafted "health of the mother" exception to the medication abortion regulation. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 416, 418 (5th Cir. 2013). Finding the other requirements for a stay pending appeal to be satisfied, the court of appeals stayed the district court's judgment in part. *Id*. at 419. The appeal was expedited for this court's full consideration of the merits. *Id*.

Planned Parenthood appealed to the Supreme Court for emergency relief.[5] In a five–four decision, with writings on both sides, the Court refused to vacate this court's stay. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506 (2013).

In this appeal, the State maintains that the district court erred in four respects: granting standing to abortion providers to assert physicians' and patients' rights vis-à-vis the issues raised; facially invalidating the admitting-privileges regulation; creating a "broad and vague 'health' exception" to the medication abortion regulations; and enforcing an injunction beyond the rights of the plaintiffs in this case. We address these issues in turn.

---

[5] In its brief filed with the Supreme Court in support of the emergency application to vacate stay, Planned Parenthood only addressed the hospital admitting privileges injunction and failed to challenge the off–label protocol injunction as this court had reframed it. *See* Brief for Applicant, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506 (2013) (No. 13A452).

No.  13-51008

## II.    Preliminary Issues

## A.  Standards of Review

At the outset, we are confronted by the district court's pre–enforcement facial invalidation of these state law provisions *in toto*.  Standard principles of constitutional adjudication require courts to engage in facial invalidation only if no possible application of the challenged law would be constitutional.  *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (citing *United States v. Salerno*, 481, U.S. 739, 745 (1987)).  This court applied the principle in *Barnes v. Mississippi* when construing a Mississippi abortion statute. 992 F.2d 1335, 1342 (5th Cir. 1993).  However, whether the Supreme Court applies this rule in the same way in abortion cases as in others is uncertain. In *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Court noted the implication in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 895 (1992), that an abortion–regulating statute would fail constitutional muster if it erected an undue burden on women's decisions to choose abortion in a "large fraction" of cases.  As in the stay opinion, we will apply the "large fraction" nomenclature for the sake of argument only, without casting doubt on the general rule.  *Cf. Abbott*, 734 F.3d at 414.

To assess the court's rendition of injunctive relief, we review its legal conclusions *de novo*, factfindings for clear error, and the ultimate decision to enjoin enforcement of H.B. 2 for abuse of discretion.  *Voting for Am.*, 732 F.3d at 386.

We also must consider the proper place of H.B. 2's comprehensive and careful severability provision, to which the district court barely referred. Federal courts are bound to apply state law severability provisions.  *Leavitt v. Jane L.*, 518 U.S. 137, 138-39 (1996).    Even when considering facial invalidation of a state statute, the court must preserve the valid scope of the

provision to the greatest extent possible. Later as-applied challenges can always deal with subsequent, concrete constitutional issues.

## B. Standing

The district court ruled perfunctorily that abortion providers have never been denied standing to assert the rights of patients. *Planned Parenthood of Greater Tex. Surgical Health Servs v. Abbott*, 951 F. Supp. 2d 891, 897 (W.D. Tex. 2013). The rule for third–party standing requires the named plaintiff to have suffered an injury in fact and to share a "close" relationship with third–parties who face an obstacle inhibiting them from bringing the claim on their own behalf. *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004). Here, the requirements for third–party standing are met in relation to the claims asserted by the physician–plaintiffs on behalf of their patients because (1) the physicians face potential administrative and criminal penalties for failing to comply with H.B. 2,[6] (2) doctors who perform abortions share a sufficiently close relationship with their patients,[7] and (3) a pregnant woman seeking to assert her right to abortion faces obvious hindrances in timely bringing a lawsuit to fruition.[8] Because the physician–plaintiffs have third–party standing to assert the rights of their patients in this litigation, as well as standing to assert their own rights,[9] we need not consider the issue of standing

---

[6] *See* TEX. HEALTH & SAFETY CODE §§ 171.0031(b), 171.064 (West 2013); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) ("The physician is the one against whom [H.B. 2] directly operate[s] in the event he procures an abortion that does not meet the statutory exceptions and conditions. The [physician], therefore, assert[s] a sufficiently direct threat of personal detriment.").

[7] *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) ("Aside from the woman herself, . . . the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, [the constitutionally protected abortion] decision.").

[8] *Id.* at 117-18.

[9] The State argues that, where third–party standing is concerned, there may be a point at which the doctor's interests begin to conflict with his patient's. For example, the doctor's economic incentives regarding the performance of abortions may not always align

as it relates to the remaining plaintiffs. *See Watt v. Energy Action Educ. Found.* 454 U.S. 151, 160 (1981); *Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm.*, 840 F.2d 258, 263 (5th Cir. 1988).

## C. Substantive Due Process Standard

A trio of widely-known Supreme Court decisions provides the framework for ruling on the constitutionality of H.B. 2. In *Roe v. Wade*, the Court held that the Fourteenth Amendment's concept of personal liberty encompasses a woman's right to end a pregnancy by abortion. *Roe v. Wade*, 410 U.S. 113, 153 (1973). In *Casey*, the Court reaffirmed what it regarded as *Roe*'s "essential holding," the right to abort before viability, the point at which the unborn life can survive outside of the womb. *Casey*, 505 U.S. at 870, 878. Before viability, the State may not impose an "undue burden," defined as any regulation that has the purpose or effect of creating a "substantial obstacle" to a woman's choice. *Id.* at 874, 878. In *Gonzalez*, the Court added that abortion restrictions must also pass rational basis review. *Gonzalez*, 550 U.S. at 158 (holding that the State may ban certain abortion procedures and substitute others provided that "it has a rational basis to act, *and* it does not impose an undue burden" (emphasis added)).

Planned Parenthood urges a stricter standard of review for the state's admitting–privileges regulation than *Casey*'s undue burden standard because this regulation allegedly protects only the mother's health rather than fetal life. Appellees cite *City of Akron v. Akron Ctr. for Reprod. Health,* 462 U.S. 416, 431 (1983), to support their position. This argument is wrong on several grounds. First, no such bifurcation has been recognized by the Supreme Court. Second, *Akron*'s application of strict scrutiny was replaced by *Casey*'s undue

with a woman's right to choose to have an abortion. We are convinced that such no such conflict exists here, however.

No.  13-51008

burden balancing test, 505 U.S. at 871.  Third, Planned Parenthood's proposed standard was not applied even by the district court in this case, nor do appellees cite a single Supreme Court or lower court opinion that has attempted to modify *Casey* in the way they propose.  Fourth, the state's regulatory interest cannot be bifurcated simply between mothers' and children's health; every limit on abortion that furthers a mother's health also protects any existing children and her future ability to bear children even if it facilitates a particular abortion.  In sum, the governing test articulated by *Casey* applies here, and the fundamental question is whether Planned Parenthood has met its burden to prove that the admitting privileges regulation imposes an undue burden on a woman's ability to choose an abortion; only in that situation does the state abridge "the heart of the liberty protected by the Due Process Clause." *Casey*, 505 U.S. at 874.

## III.   Admitting Privileges Requirement

The State's appeal of the ruling invalidating the admitting–privileges requirement turns on the district court opinion's analysis of Planned Parenthood's substantive due process claim.   Planned Parenthood argued at trial that the admitting–privileges requirement lacked a rational basis and imposed an undue burden on a woman's right to choose an abortion.  The opinion agreed with both parts of Planned Parenthood's argument.   The opinion, however, applied the wrong legal standards under rational basis review and erred in finding that the admitting–privileges requirement amounts to an undue burden for a "large fraction" of the women that it affects.

### A.

To show that the admitting–privileges requirement lacked a rational basis, Dr. Paul Fine, a board–certified obstetrician and gynecologist ("Ob/Gyn") and director of one of the plaintiff clinics, testified that women face an

No.  13-51008

"extremely low" risk of experiencing some type of complication after an abortion.  According to the studies referred to by Dr. Fine, only 2.5 percent of women who have a first–trimester surgical abortion undergo minor complications, while fewer than 0.3 percent experience a complication that requires hospitalization.  As for those abortion patients who need hospital care, Dr. Fine indicated that "the appropriate course of action would be to refer the woman to a nearby emergency room" because, from his perspective, ER physicians are qualified to treat most post-abortion complications, and can consult with the Ob/Gyn on-call in the event that they determine that a specialist is required.  Similarly, Dr. Jennifer Carnell, a board–certified emergency medicine practitioner, explained that ER physicians have experience in treating abortion-related complications, which are very similar to the symptoms of miscarriage, a condition commonly seen in ERs. Consequently, the abortion practitioners do not need admitting privileges.

Dr. Fine further testified that the admitting–privileges provision has the effect of restricting the availability of abortion in the state.  Joseph Potter, a sociology professor, testified that the requirement will close one–third of the state's abortion facilities, and, as a result, prevent at least 22,286 women annually—slightly less than a third of the number of women who seek abortions in the state each year—from procuring an abortion.[10]   Andrea Ferrigno, corporate vice president of plaintiff Whole Woman's Health ("WWH"), indicated that her organization's clinic in McAllen would close due to the admitting-privileges requirement.  Separate from the provision's alleged effects on abortion access in the Rio Grande Valley, Amy Hagstrom–Miller, an

---

[10] According to the Texas Department of State Health Services, 72,470 abortions were performed in Texas in 2011, with 70,003 obtained by Texas residents.  Table 33: Selected Characteristics of Induced Terminations of Pregnancy, Texas Residents, 2011, *available at* http://www.dshs.state.tx.us/chs/vstat/vs11/t33.shtm.

owner of WWH, and Ferrigno testified that their clinics in Fort Worth and San Antonio would close, and Dr. Darrell Jordan, chief medical officer of plaintiff Planned Parenthood of Greater Texas, testified that his organization's clinics in Austin, Waco, and Dallas would shut their doors.

To explain the challenges that providers faced in complying with the admitting–privileges requirement, Hagstrom–Miller testified that eleven of the fourteen physicians at her clinics are over the age of sixty, and six are over the age of seventy. Hagstrom–Miller further testified that WWH recently attempted to recruit five physicians. In Hagstrom–Miller's words, three of them "were unable to join WWH staff because their primary practice or hospitals barred them from working as abortion care providers." The fourth was reluctant to join after the 2009 murder of Dr. George Tiller, a Kansas–based physician who performed abortions. The fifth was forbidden because the chair of his department does not permit moonlighting in general and did not want the doctor to be affiliated with abortion practice.

Additionally, Hagstrom–Miller stated that WWH was in contact with several physicians who had previously done some work with her clinics. Two of these doctors claimed that they were not interested in joining WWH because of their concern that future changes in the law would make it impossible to provide abortions in the state. One declined because he planned to open an obstetrics practice and feared that involving himself in abortion practice would cost him business; ultimately this physician joined a practice owned by a Catholic association which forbids any affiliation with abortion providers. Another physician was at a Catholic hospital which allegedly directed the doctor to sever contact with WWH, and ultimately fired him due to his "outspoken support" for abortion rights. Another, who had spent one day–a–week working with WWH, decided to take a position in New York due to the

passing of abortion restrictions, including H.B. 2, and the need to pay student loans. Finally, one physician, who worked with WWH, decided not to continue with the organization after the passage of H.B. 2, concluding that it would be impossible to obtain admitting privileges given the caseload requirements at one of the local hospitals and the fact that the other is a Catholic hospital that, in apparent violation of federal and state law, declines to grant privileges on the basis of an applicant's association with abortion practice.

In response to Planned Parenthood, Dr. John Thorp, a board-certified Ob/Gyn, offered the most comprehensive statement of the requirement's rationale:

> There are four main benefits supporting the requirement that operating surgeons hold local hospital admitting and staff privileges: (a) it provides a more thorough evaluation mechanism of physician competency which better protects patient safety; (b) it acknowledges and enables the importance of continuity of care; (c) it enhances inter–physician communication and optimizes patient information transfer and complication management; and (d) it supports the ethical duty of care for the operating physician to prevent patient abandonment.

The State focused its defense of the admitting-privileges requirement on two of these factors: continuity of care and credentialing. To demonstrate the importance of the former, Dr. Thorp referred to several studies, including a report of a joint commission of hospitals, including Johns Hopkins, Mayo Clinic, and New York Presbyterian, which concluded that "80 percent of serious medical errors involve miscommunication between caregivers when patients are transferred or handed–off." Dr. James Anderson, an ER physician, also testified that an abortion provider with admitting privileges is better suited than one not admitted to know which specialist at the hospital to consult in cases where an abortion patient presents herself at an ER with serious complications. Further, Dr. Thorp doubted that without the admitting-

11

privileges requirement hospitals in Texas could, as Dr. Fine suggested, promptly treat women with abortion-related complications.  This was because 73 percent of ERs nationwide, according to a statistic cited by Dr. Thorp, lack adequate on-call coverage by specialist physicians, including Ob/Gyns.  Thus, requiring abortion providers to obtain admitting privileges will reduce the delay in treatment and decrease health risk for abortion patients with critical complications.

Dr. Thorp also opined that the admitting–privileges requirement would ensure that only physicians "credentialed and board certified to perform procedures generally recognized within the scope of their medical training and competence" would provide abortions.  Dr. Mikeal Love, a board–certified Ob/Gyn, concurred that the admitting–privileges provision enlists hospitals to "screen out" untrained and incompetent abortion providers, who could not continue in the abortion practice if they were not able to obtain admitting privileges.  Echoing this sentiment, Dr. Anderson agreed that credentialing would enhance the quality of care, noting that "hospital credentialing acts as another layer of protection for patient safety."

Finally, Dr. Thorp disputed Dr. Fine's conclusions as to the percentage of abortions that result in complications.  According to Dr. Thorp, the 0.3 percent estimate of women requiring hospitalization from abortion complications is based on data that are thirty-eight years old.   Dr. Thorp further testified that complications from abortion are underreported, and he cited a study indicating that only one–third to one–half of abortion patients return to their clinic for follow–up care.

The State also attacked Planned Parenthood's evidence as to the effects of the admitting–privileges requirement. During its examination of Dr. Potter, the State elicited testimony that Dr. Potter relied on statements of predicted

No. 13-51008

clinic closures provided by the plaintiffs, their attorneys, and other unknown individuals who were interviewed by Dr. Daniel Grossman, an abortion provider with whom Dr. Potter works. As Dr. Potter explained: "We are using information that was obtained by—from Plaintiffs and by Dr. Grossman from providers. There's no science there." Peter Uhlenberg, a sociology professor, also testified that Dr. Potter's estimate was inaccurate because Potter assumed that abortion facilities unaffected by the admitting–privileges restriction would perform the same number of abortions as they did before the provision passed. Dr. Uhlenberg argued that it was more likely that these clinics would perform more abortions in the face of higher demand if women travelled from parts of the state where fewer abortion facilities remained as a consequence of H.B. 2.

**B.**

According to its interpretation of the Supreme Court's holdings, the district court's opinion found no rational basis for the new provision and condemned it as having a purpose or effect to stymie women's abortion access. The opinion repeatedly stated that the State produced "no evidence" that a rational relationship exists between an abortion provider's admitting privileges to a hospital and improved patient care at emergency facilities handling patient complications. Moreover, the opinion found "no evidence" that admitting privileges to a hospital within thirty miles of the abortion provider's clinic "address issues of patient abandonment, hospital costs, or accountability."

The opinion next concluded that the statute places an undue burden on women seeking an abortion. In a brief four–paragraph discussion, the opinion found that some (unidentified) abortion clinics will close and "24 counties in the Rio Grande Valley would be left with no abortion provider because those

13

abortion providers do not have admitting privileges and are unlikely to get them." Drawing on Hagstrom–Miller's testimony, the opinion expressed concern that older physicians associated with particular clinics will be unable to qualify for hospital–admitting privileges and dismissed as overly optimistic the notion that abortion providers would be able to find qualified replacement physicians. The opinion also noted evidence showing that "the vast majority" of abortion providers do not engage in enough surgical procedures to qualify for admission to hospital staffs. Thus, by the opinion's prediction, the closure of facilities was essentially imminent and irreversible.

The opinion also held, in one sentence, that the State "fails to show a valid purpose for requiring that abortion providers have hospital privileges within 30 miles of the clinic where they practice." Accordingly, the "purpose" prong of the *Casey* inquiry was not satisfied as to this provision.

**C.**

The district court's opinion took the wrong approach to the rational basis test. Nothing in the Supreme Court's abortion jurisprudence deviates from the essential attributes of the rational basis test, which affirms a vital principle of democratic self–government. It is not the courts' duty to second guess legislative factfinding, "improve" on, or "cleanse" the legislative process by allowing relitigation of the facts that led to the passage of a law. *Heller v. Doe*, 509 U.S. 312, 320 (1993) (providing that a state "has no obligation to produce evidence to sustain the rationality of a statutory classification"). Under rational basis review, courts must presume that the law in question is valid and sustain it so long as the law is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). As the Supreme Court has often stressed, the rational basis test seeks only to determine whether any conceivable rationale exists for an enactment. *F.C.C.*

No. 13-51008

*v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993) (citing cases). Because the determination does not lend itself to an evidentiary inquiry in court, the state is not required to "prove" that the objective of the law would be fulfilled. *Id.* at 315 (holding that "a legislative choice is not subject to courtroom fact–finding"). Most legislation deals ultimately in probabilities, the estimation of the people's representatives that a law will be beneficial to the community. Success often cannot be "proven" in advance. The court may not replace legislative predictions or calculations of probabilities with its own, else it usurps the legislative power. *Heller*, 509 U.S. at 319 (stating that rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices"); *Beach Commc'ns*, 508 U.S. at 315 (explaining that judicial deference to legislative choice "preserve[s] to the legislative branch its rightful independence and its ability to function"). A law "based on rational speculation unsupported by evidence or empirical data" satisfies rational basis review. *Beach Commc'ns*, 508 U.S. at 315. The fact that reasonable minds can disagree on legislation, moreover, suffices to prove that the law has a rational basis. Finally, there is no least restrictive means component to rational basis review. *Heller*, 509 U.S. at 321 (holding that courts must accept a legislature's generalizations under rational basis review "even when there is an imperfect fit between means and ends" or where the classification "is not made with mathematical nicety").

This rule of restraint is particularly important in the realm of constitutional adjudication for a simple reason. If legislators' predictions about a law fail to serve their purpose, the law can be changed. Once the courts have held a law unconstitutional, however, only a constitutional amendment, or the wisdom of a majority of justices overcoming the strong pull of *stare decisis*, will permit that or similar laws to again take effect.

15

No.  13-51008

Viewed from the proper perspective, the State's articulation of rational legislative objectives, which was backed by evidence placed before the state legislature, easily supplied a connection between the admitting–privileges rule and the desirable protection of abortion patients' health.  Dr. Love, who trained at an abortion facility and served as the Chairman of the Ob/Gyn section of St. David's Medical Center in Austin, testified before the Texas Legislature that the general standard of care requires hospital privileges for physicians who perform abortions.   At trial, moreover, the State established that the admitting–privileges requirement was based on the "rational speculation," if not empirical data, that the regulation "would assist in preventing patient abandonment by the physician who performed the abortion and then left the patient to her own devices to obtain care if complications developed."  *Abbott*, 734 F.3d at 411.

During these proceedings, Planned Parenthood conceded that at least 210 women in Texas annually must be hospitalized after seeking an abortion. Witnesses on both sides further testified that some of the women who are hospitalized after an abortion have complications that require an Ob/Gyn specialist's treatment.  Against Planned Parenthood's claims that these women can be adequately treated without the admitting–privileges requirement, the State showed that many hospitals lack an Ob/Gyn on call for emergencies. Requiring abortion providers to have admitting privileges would also promote the continuity of care in all cases, reducing the risk of injury caused by miscommunication and misdiagnosis when a patient is transferred from one health care provider to another.  As Dr. Thorp testified, the abortion provider is most familiar with the patient's medical history and therefore in the best position to diagnose and correct a complication that arises from the abortion. The State's witnesses also explained that admitting–privileges requirement

16

No.  13-51008

was needed to maintain the standard of care within the abortion practice.  The specter of Dr. Kermit Gosnell informed the testimony of Dr. Love and Dr. Anderson, both of whom explained that the credentialing process entailed in the regulation reduces the risk that abortion patients will be subjected to woefully inadequate treatment.  Applying the rational basis test correctly, we have to conclude that the State acted within its prerogative to regulate the medical profession by heeding these patient–centered concerns and requiring abortion practitioners to obtain admitting privileges at a nearby hospital.

This conclusion is consistent with rulings from the Fourth and Eighth Circuits sustaining admitting-privileges regulations similar to the one at issue here.[11]   Although Planned Parenthood points out that the law upheld by the Eighth Circuit lacked a restriction similar to H.B. 2's requirement that the provider have privileges within 30 miles of the abortion facility, this is a distinction without a difference.  There is sufficient evidence here that the geographic restriction has a rational basis.  For example, the State cites the recommendation from the National Abortion Foundation that abortion patients searching for a doctor should find one who "[i]n the case of an emergency" can "admit patients to a nearby hospital (no more than 20 minutes away)."  National Abortion Federation, *Having an Abortion? Your Guide to Good Care* (2000).  The rationale is further supported by Dr. Love's testimony that an abortion patient is likely to call her physician, who then "tells the patient to meet the physician at the hospital where he or she has privileges."  The geographic restriction allows this meeting to occur within 30 miles of

---

[11] *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envlt. Control*, 317 F.3d 357, 360, 363 (4th Cir. 2002) (holding a South Carolina regulation requiring abortion providers to have admitting privileges at a local hospital to be "so obviously beneficial to patients"); *Women's Health Ctr. of W. Cnty., Inc. v. Webster,* 871 F.2d 1377, 1381 (8th Cir. 1989) (ruling that a Missouri statute requiring abortion providers to have admitting privileges "furthers important state health objectives").

No. 13-51008

where the abortion was performed.    In any case, the State is not required under rational basis review to choose the least restrictive means to achieve a legitimate goal. *Cf. Heller*, 509 U.S. at 321.  Thus, the geographic restriction does not affect our conclusion that the admitting–privileges requirement, as enacted, has a rational basis.

The Seventh Circuit recently questioned the constitutionality of a Wisconsin admitting–privileges law. *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013).  The court was asked, however, only whether the district judge was justified in entering a *preliminary* injunction against the Wisconsin requirement. *Id*. at 788 ("All we decide today is whether the district judge was justified in entering the preliminary injunction.").  The difference between the procedural posture of the Seventh Circuit case and ours is crucial for two reasons.  First, unlike our review of the entry of a permanent injunction after a trial on the merits, the Seventh Circuit's ruling was based on a *pre*–trial record, which the circuit court emphasized was "sparse" and could be "critically altered" and "cast . . . in a different light" by the presentation of evidence at trial. *Id*. at 788, 789, 799.  Second, unlike H.B. 2, which afforded abortion providers a grace period of more than 100 days to apply for admitting–privileges, the Wisconsin provision was signed into law on a Friday and became effective the following Monday. *Id*. at 788.  The immediate effective date of the Wisconsin law furnished "a compelling reason for the preliminary injunction." *Id*. at 789. Since it takes at least two months to obtain admitting privileges in Wisconsin, the *Van Hollen* panel unanimously agreed that the requirement could not have been complied with unless the preliminary injunction was granted. *Id*. at 788–89, 793 (Posner, J.), 799 (Manion, J., concurring).

18

No. 13-51008

To the extent that *Van Hollen*'s lengthy discussion of the merits of the Wisconsin law conflicts with our ruling, however, we are unpersuaded by the concerns of the majority.    *Van Hollen* faults the state of Wisconsin for not adducing statistical evidence that the admitting–privileges requirement will make abortions safer.  It complains that the record includes no evidence that abortion complications are underreported, *id.* at 790, that these complications require continuity of care more than other outpatient services, *id.* at 793, or that women who have complications from an abortion receiver better care if their abortion provider has hospital privileges, *id.*    The first–step in the analysis of an abortion regulation, however, is *rational* basis review, not *empirical* basis review.  *Gonzales*, 550 U.S. at 158.  By suggesting that Wisconsin needed to offer factual or statistical evidence, *Van Hollen* ignored case law from its own circuit holding, consistent with the Supreme Court's oft-repeated guidance, that there is "never a role for evidentiary proceedings" under rational basis review.  *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1127. *Van Hollen* also sees an equal protection problem lurking about the Wisconsin legislature's choice not to require that doctors who perform outpatient services other than abortions also have admitting privileges. *Van Hollen*, 738 F.3d at 790.  The appellate court posits that Wisconsin's abortion providers have been singled out by the state's legislature despite the fact that plaintiffs submitted no evidence that other outpatient doctors are actually treated differently under Wisconsin law.  *Id.* at 802 (Manion, J., concurring).  There is no requirement, moreover, that a state legislature address all surgical procedures if it chooses to address one.  States "may select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Okla. Inc.,* 348 U.S. 483, 489 (1955).

19

No.  13-51008

## D.

The district court's opinion also erred in its application of the purpose and effect prongs of the undue burden test.  *Casey* holds that the legislature may not enact an abortion regulation whose purpose is to create a substantial obstacle to a woman seeking an abortion. The plaintiffs bore the burden of attacking the State's purpose here, yet the court imposed the burden on the State to disprove an improper purpose.  This is plainly backwards.  As in litigation generally, the burden of proving the unconstitutionality of abortion regulations falls squarely on the plaintiffs.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (reversing appellate court for enjoining abortion restriction where plaintiffs had not proven that the requirement imposed an undue burden); *Casey*, 505 U.S. at 884 (affirming provision where "there is no evidence on this record" that the restriction would amount to an undue burden).  Moreover, the plaintiffs offered no evidence implying that the State enacted the admitting privileges provision in order to limit abortions; in fact, as their reply brief states, they did not attack the State's purpose at all.  There is thus no basis for a finding of impermissible purpose under *Casey*.

Even though the State articulated rational bases for this law, and even though its purpose was not impugned, Planned Parenthood could succeed if the effect of the law substantially burdened women's access to abortions in Texas.  In this respect as well, however, the opinion erred.  Its findings are vague and imprecise, fail to correlate with the evidence, and even if credited, fail to establish an undue burden according to the Supreme Court's decisions.

First, the opinion invalidated the admitting–privileges provision as it pertains to the entire state of Texas, but its only recitation of evidence concerned "24 counties in the Rio Grande Valley," which it predicted would be left with no abortion provider.  As an initial matter, the statement that *both*

clinics in the Rio Grande Valley will close may be disregarded as clearly erroneous based on the trial court record.  Hagstrom–Miller and Ferrigno each testified that there were two clinics in the Rio Grande Valley, yet the district court accepted testimony regarding only one of them.[12]  Even if we were to accept that both clinics in the Rio Grande Valley were about to close as a result of the admitting privileges provision, however, this finding does not show an undue burden.   To put this "finding" into perspective, of the 254 counties in Texas only thirteen had abortion facilities *before* H.B. 2 was to take effect.  The Rio Grande Valley, moreover, has four counties, not twenty-four, and travel between those four counties and Corpus Christi, where abortion services are still provided, takes less than three hours on Texas highways (distances up to 150 miles maximum and most far less).  In addition, Texas exempts from its 24-hour waiting period after informed consent those women who must travel more than 100 miles to an abortion facility. Tex. Health & Safety Code § 171.012(a)(4).

As the motions panel correctly concluded, based on the trial court record, an increase of travel of less than 150 miles for some women is not an undue burden under *Casey*.  *Abbott*, 734 F.3d at 415.  Indeed, the district court in *Casey* made a finding that, under the Pennsylvania law, women in 62 of Pennsylvania's 67 counties were required to "travel for at least one hour, and sometimes longer than three hours, to obtain an abortion from

---

[12] Hagstrom–Miller testified that the owner of the clinic in Harlingen—the only other abortion provider, aside from the McAllen clinic, in the Rio Grande Valley—informed her that he was planning on closing his clinic.  The district court, however, excluded this statement as hearsay.  Planned Parenthood also submitted a written declaration from Ferrigno, which contained the same hearsay statement as to the Harlingen clinic and which the State objected to on hearsay grounds before trial.  The district court noted the State's pre-trial evidentiary objections in its opinion. Without ruling on any of these objections, the court indicated that its opinion relied only on admissible evidence.  *Abbott,* 951 F. Supp. 2d at 896 n.3.

the *nearest* provider." *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1352 (E.D. Pa. 1990), *aff'd in part, rev'd in part*, 947 F.2d 682 (3d Cir. 1991), *aff'd in part, rev'd in part*, 505 U.S. 833 (1992). Upholding the law, the Supreme Court recognized that the 24-hour waiting period would require some women to make two trips over these distances. The Supreme Court nonetheless held that the Pennsylvania regulation did not impose an undue burden. We therefore conclude that *Casey* counsels against striking down a statute solely because women may have to travel long distances to obtain abortions. The record before us does not indicate that the admitting–privileges requirement imposes an undue burden by virtue of the potential increase in travel distance in the Rio Grande Valley. *Cf. Casey*, 505 U.S. at 887 ("Hence, on the record before us, and in the context of this facial challenge, we are not convinced that the 24–hour waiting period constitutes an undue burden.").

Second, the opinion's finding that "there will be abortion clinics that will close" is too vague. The opinion made no "baseline" finding as to precisely how many abortion doctors currently lack admitting privileges required by H.B. 2. Planned Parenthood cannot resurrect its assertion that one–third of the state's clinics will close or over 22,000 women will be deprived of access to abortion services each year because the district court also refused to accept these findings. Although some clinics may be required to shut their doors, there is no showing whatsoever that *any* woman will lack reasonable access to a clinic within Texas. All of the major Texas cities, including Austin, Corpus Christi, Dallas, El Paso, Houston, and San Antonio, continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges. Evidence offered by Planned Parenthood showed that more than ninety percent of the women seeking an abortion in Texas would be able to obtain the procedure within 100 miles of their respective residences even if H.B. 2 went

into effect. *Abbott*, 734 F.3d at 415. As the motions panel ruled, "[t]his does not constitute an undue burden in a large fraction of the relevant cases." *Id.*

Third, the record does not show that abortion practitioners will likely be unable to comply with the privileges requirement. In a number of areas in Texas, physicians who are performing abortions already have admitting privileges. Both state and federal law prohibit hospitals from discriminating against physicians who perform abortions when they grant admitting privileges.[13] Further, it is undisputed that many hospitals extend admitting privileges without regard to the number of hospital admissions that a physician has had in the past. To be sure, the district court's opinion also found that the "vast majority" of abortion providers could not obtain privileges at hospitals with a minimum admissions requirement because abortion providers do "not generally yield any hospital admissions." *Abbott*, 2013 WL 5781583, at *5. Yet this finding proves little for the reason explained by the motions panel:

> Even if some hospitals have annual admission requirements, it is hardly surprising that the physicians identified by the plaintiffs have virtually no history of hospital admissions since the experts presented by the plaintiffs argued that it is the practice of many abortion physicians to instruct their patients to seek care from an emergency room if complications arise.

---

[13] Texas law specifically prohibits discrimination by hospitals or health care facilities against physicians who perform abortions. "A hospital or health care facility may not discriminate against a physician, nurse, staff member or employee because of the person's willingness to participate in an abortion procedure at another facility." TEX. OCC. CODE ANN. § 103.002(b) (West 2013). Texas law further provides a private cause of action for an individual to enforce this non–discrimination right. *Id.* § 1003.003. Federal law similarly prohibits any entity that receives a "grant, contract, loan, or loan guarantee under the Public Health Service Act, the Community Mental Health Centers Act, or the Development Disabilities Services and Facilities Construction Act" or a "grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services" from discriminating "in the extension of staff of other privileges to any physician or other health care personnel . . . because he performed or assisted in the performance of a lawful sterilization procedure or abortion." 42 U.S.C. § 300a-7(c).

*Abbott*, 734 F.3d at 416.

Moreover, the opinion drew the wrong lessons from Hagstrom–Miller's testimony when it relied on her "difficulties getting the current physicians" at WWH in compliance with H.B. 2. *Abbott*, 951 F. Supp. 2d at 901. Hagstrom–Miller described her efforts in obtaining admitting privileges for just two of her organization's current physicians—its primary physician in McAllen, who does not qualify for admitting privileges because he is not a board–certified Ob/Gyn, and a physician in Beaumont, whose application the hospital had yet to process. The remainder of Hagstrom–Miller's testimony concerned her difficulties recruiting *new* physicians and retaining the physicians who had previously done some work for WWH. These challenges were almost entirely unrelated to H.B. 2. Four of the five physicians that she endeavored to recruit could not be persuaded to join WWH because they felt deterred by the terms of their existing employment. The fifth feared anti–abortion violence. None of these reasons is connected with H.B. 2. As to the other physicians, who had previously done some work with WWH, two were worried about the passage of *future* legislation (not H.B. 2), three were prevented by their employers, and one found work in New York. All told, only one of the physicians that Hagstrom–Miller contacted declined to provide abortions in Texas as a consequence of H.B. 2. Here again, we are in substantial accord with the motions panel, which concluded that "many factors other than the hospital–admitting–privileges requirement" affected abortion access in the Rio Grande Valley. *Abbott*, 734 F.3d at 415. There is even less probative evidence regarding the rest of the state.[14]

---

[14] To the extent that the State and Planned Parenthood rely on developments since the conclusion of the bench trial and during this appeal, we do not consider any arguments based on those facts, nor do we rely on any facts asserted in amicus briefs. This opinions is confined to the record before the trial court.

No.  13-51008

**E.**

In sum, the district court's opinion applied wrong legal standards on the rational basis and purpose tests and clearly erred in finding that "24 counties in the Rio Grande Valley would be left with no abortion provider." With regard to the remainder of the state, the district court opinion erroneously concluded that H.B. 2 imposed an undue burden in a large fraction of the cases. The evidence presented to the district court demonstrates that if the admitting–privileges regulation burdens abortion access by diminishing the number of doctors who will perform abortions and requiring women to travel farther, the burden does not fall on the vast majority of Texas women seeking abortions. Put otherwise, the regulation will not affect a significant (much less "large") fraction of such women, and it imposes on other women in Texas less of a burden than the waiting–period provision upheld in *Casey*. *Casey*, 505 U.S. at 885-87. This suffices to sustain the admitting–privileges requirement.

**F.**

The court's opinion rejected Planned Parenthood's challenge to the admitting–privileges provision on vagueness grounds and did not rule on plaintiffs' procedural due process and unlawful delegation claims. It is not necessary to remand either of the unresolved arguments to the district court. The unlawful delegation argument fails for the reasons set forth in *Women's Health Center of West County, Inc. v. Webster*, where the Eighth Circuit held:

> The requirement that physicians performing abortions obtain surgical privileges, which involves the independent action of a public or private hospital, poses no more significant threat to plaintiffs' due process rights than the requirement that those performing abortions be licensed physicians, which involves the independent action of a medical licensing board.

871 F.2d 1377, 1382 (8th Cir. 1989). As for the procedural due process argument, Planned Parenthood contends that H.B. 2 did not offer abortion

No.  13-51008

providers a long enough "grace period" to comply with the admitting-privileges provision.  H.B. 2, however, gave abortion providers approximately 100 days to apply for admitting privilege, which, on its face, is a sufficient grace period. *Atkins v. Parker*, 472 U.S. 115, 130-31 (1985) (maintaining that "a grace period of over 90 days" is adequate).  By the same token, it would be absurd to enforce H.B. 2 against physicians who *timely* applied for admitting privileges but have not heard back from the hospital, which can take up to 170 days from the date of application under Texas law.  *See* TEX. HEALTH & SAFETY CODE §  41.101 (setting deadlines by which hospitals must act on admitting-privileges applications).  Obviously, it is unreasonable to expect that all abortion providers will be able to comply with the admitting-privileges provision within 100 days where receiving a response from a hospital processing an application for admitting privileges can take 170 days.   Accordingly, we conclude that pursuant to H.B. 2's severability provision, § 10(b), the admitting–privileges requirement may not be enforced against abortion providers who applied for admitting privileges within the grace period allowed under H.B. 2, but are awaiting a response from a hospital.

## IV.    Protocol for Medication Abortions

In addition to requiring hospital admitting privileges, H.B. 2 mandates that medication abortions satisfy the protocol approved for such abortions by the FDA and outlined in the final printed label ("FPL") for the abortifacient drug mifepristone.  Since the FDA authorized the protocol for medication abortions in 2000, doctors performing such abortions in Texas, and apparently across the country, have developed an off–label protocol that differs from the FDA–approved version in terms of dosage amounts and administration of the two abortion drugs—mifepristone and misoprostol. In particular, although the FPL limits the administration of a medication abortion to forty–nine days

following a woman's last menstrual period ("LMP"), doctors regularly administer medication abortions up to sixty–three days LMP, and sometimes as late as seventy days LMP.

In ruling on Planned Parenthood's facial challenge of the medication abortion regulations, the opinion found that such regulations do not impose an undue burden on a woman seeking an abortion between one and forty–nine days LMP. [15]  Neither party challenges the district court's conclusion on this point.  The opinion went further and found that H.B. 2 does place a substantial obstacle in the path of a woman seeking an abortion between fifty and sixty–three days LMP in situations where surgical abortion is not a medically sound or safe alternative for her.  Enjoining application of the law even beyond this finding, however, the district court ruled that H.B. 2's medication abortion provisions, though constitutional, could not be enforced against any physician who determined that using an off–label protocol for a medication abortion (i.e., performing a medication abortion between fifty and sixty–three days LMP) was necessary "for the preservation of the life or health of the mother."  *Abbott*, 951 F. Supp. 2d at 908–09.

Planned Parenthood essentially concedes the constitutionality of the FDA protocol as it applies to medication abortions between one and forty–nine days LMP.  Because we are required to decide a constitutional case on the narrowest grounds presented, we will assume the district court meant to align

---

[15] Recently, the Sixth Circuit upheld, in a 2-1 ruling, an Ohio abortion statute that mandated adherence to the FDA–approved forty–nine day LMP limit for medication abortions.  *Planned Parenthood S.W. Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir. 2012).  The Sixth Circuit reasoned that the constitution protects a woman's right to have an abortion, but it does not protect a woman's choice in the *method* of abortion.  *Id.* at 514–15.  The court found no evidence that banning medical abortions after forty–nine days LMP imposed an undue burden on a woman's right to bodily integrity or to choose abortion, or that an alleged increase in costs and mandatory doctor visits constituted an undue burden as compared to what the Supreme Court rejected in *Casey*.  *Id.*

No.  13-51008

the scope of the injunction with the narrower scope of its reasoning.  Planned Parenthood's defense of the injunction accords with this view.  Our discussion is thus confined to the question whether the district court erred in holding that H.B. 2's rejection of the off–label protocol from fifty to sixty–three days LMP constitutes an undue burden on the abortion rights of women who, because of particular gynecological abnormalities, cannot safely undergo surgical abortion during that period.  *See Gonzales*, 550 U.S. at 161.

## A.

During trial, both sides presented expert witness testimony and declarations opining on the safety and efficacy of medication abortions.  For Planned Parenthood, Dr. Fine stated his opinion that H.B. 2's medication abortion requirements are medically unnecessary and will not improve patient health and safety.  In particular, Dr. Fine stated that off–label medication abortions are very safe and highly effective through sixty–three days LMP and that although the FDA has placed certain limitations on the use of mifepristone, those limitations have never required physicians to stop using it after forty–nine days LMP.  Dr. Fine indicated that medication abortions are preferable to surgical abortions for women who want to have more personal control over the process or who fear the invasive nature of a surgical abortion.  Dr. Fine also asserted that some women have medical conditions that make first–trimester surgical abortion extremely difficult, if not impossible.  These scenarios include women who are extremely obese, have uterine fibroids distorting normal anatomy, have a uterus that is very flexed, or have certain uterine anomalies, such as a malformed uterus.  Dr. Fine also opined that medication abortions may be significantly safer than surgical abortions for women who have a stenotic cervix or have undergone female genital mutilation.  These latter conditions make it very difficult to dilate a woman's

28

cervix, and Dr. Fine stated that performing a surgical abortion on a woman suffering from such conditions would put her at greater risk of damage to her cervix as well as other complications, such as uterine perforation. The bottom line, according to Dr. Fine, is that for women who suffer from certain medical conditions that make surgical abortion significantly more risky, H.B. 2 acts as a ban to previability abortion after forty–nine days LMP.

The State, on the other hand, adduced reasons for upholding the FDA protocol in its entirety, irrespective of a life and health exception. As to the FDA–approved forty–nine day LMP limit, the State's expert, Dr. Donna Harrison, pointed out that the FDA's approval of mifepristone as an abortifacient hinged on the imposition of post–approval restrictions, which have included requiring women to sign a Patient Agreement before using mifepristone. Among other things, the Patient Agreement requires a woman to confirm prior to the medication abortion that she believes she is no more than forty–nine days pregnant. Dr. Harrison also emphasized how medical research has shown that drug–induced abortions present more medical complications and adverse events than surgical abortions, with six percent of medication abortions eventually requiring surgery to complete the abortion, often on an emergency basis. With this statistic in mind, Dr. Harrison opined that when surgery is already contraindicated for a woman, it would be medically irresponsible and contrary to her best interest for a physician to submit her to a medication abortion, for in the event an emergency surgical abortion is later needed, she will be placed at an even higher risk of adverse health results.

## B.

Considering the evidence, the district court opinion found that "there are certain situations where medication abortion is the only safe and medically

sound option for women with particular physical abnormalities or preexisting conditions." *Abbott*, 951 F. Supp. 2d at 907. The opinion also concluded, while noting it had no specific evidence on the point, that "it is possible that a sizeable fraction of women may [first] discover pregnancy or elect abortion during the period from 50 to 63 days LMP." *Id.* at 906 n.20. Accordingly, the opinion found that for women who discover or elect abortion between fifty and sixty–three days LMP, but for whom surgical abortion represents a significant health risk, H.B. 2's regulations of medication abortion "act as a total method ban after 49 days LMP," thereby "plac[ing] a substantial obstacle" in the way of a woman's right to abortion. *Id.* at 907. The opinion emphasized that H.B. 2 did not fail constitutional review due to the lack of a specific health–of–the–mother exception. Nevertheless, the court enjoined enforcement of H.B. 2's medication abortion regulations "to the extent those provisions prohibit a medication abortion where a physician determines in appropriate medical judgment, [that] such a procedure is necessary for the preservation of the life or health of the mother." The court's injunction also indiscriminately enjoined the State from enforcing certain H.B. 2 requirements that Planned Parenthood never challenged and that have nothing to do with patients' access to drug-induced abortions.[16] Indeed, Planned Parenthood does not seek to affirm this part of the injunction on appeal.

---

[16] As summarized by this court in its prior opinion,

The Final Judgment . . . removes the requirement in [Texas Health and Safety Code] § 171.063(c) that before the physician may dispense or administer an abortion–inducing drug, he or she must examine the pregnant woman and document, in the patient's medical record, the gestational age, and intrauterine location of the pregnancy. The injunction similarly inexplicably removes the requirement in § 171.063(e) that the physician schedule a follow-up visit for a woman who has received an abortion–inducing drug not more than 14 days after the administration of the drug and the requirement that at that follow–up visit, the physician must determine whether the pregnancy is completely terminated and assess the degree of bleeding. The injunction likewise removes the applicability of § 171.063(f), which also

No. 13-51008

## C.

To evaluate the district court's partial injunction against H.B. 2's medication abortion regulations, we turn once more to *Gonzales*. In *Gonzales* the Supreme Court considered whether the Partial–Birth Abortion Ban Act of 2003 ("the Act"), which otherwise passed constitutional muster against the respondents' facial challenges, had the effect of imposing an unconstitutional burden on a woman's right to abortion because it did not allow the use of intact dilation and evacuation ("D & E") where "necessary, in appropriate medical judgment, for the preservation of the . . . health of the mother." *Gonzales*, 550 U.S. at 161 (internal quotation marks omitted) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 327-28 (2006)). In addressing this issue, the Court reasoned that the lack of a health exception in an abortion statute imposes an unconstitutional burden on a woman's right to abortion if it subjects a woman to significant health risks.[17]  *Id.*

---

pertains to the follow–up visit. There is no indication from the district court's opinion that there is any constitutional infirmity in these sections.
*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 418-19 (5th Cir. 2013).

[17] The State suggests that introductory language to H.B. 2 specifies a general statutory intent to preserve the life or health of the mother, by stating: "[T]his Act does not apply to abortions that are necessary to avert the death or substantial and irreversible physical impairment of a major bodily function of the pregnant woman." Section 1(4)(B). According to the State, this language, plus its in-court assurances that no physician would be prosecuted for a medication abortion outside the FDA protocol if the health of the woman was jeopardized as provided, renders the district court's inclusion of its own health provision redundant. We doubt that the statute creates a general limitation. First, the language appears in a provision that describes only H.B. 2's prohibition on late–term abortions, which is not at issue in this case. It is arguable that this health of the mother language concerns only late–term abortions. Second, even if a legislature's statutory declarations of purpose, as opposed to its affirmative dictates, apply in holistic interpretation of the entire statute, this language does not appear broad enough to cover the type of reproductive system abnormalities or conditions that, according to Dr. Fine, render medication abortions safer for certain women during the 50-63 day LMP window at issue here. Because of the above disposition, however, we do not resolve this issue.

No.  13-51008

The respondents in *Gonzales* proffered evidence concerning intact D & E, including that it "was safer for women with certain medical conditions or women with fetuses that had certain anomalies."  *Id.*  Despite this evidence, the Court found that the Act's lack of a health exception did not facially impose an undue burden on the right to abortion because (1) there was medical disagreement as to whether prohibiting intact D & E as a method of abortion would actually impose a significant health risk on women,[18] *id.* at 162-64; (2) alternative methods to intact D & E remained available for women seeking abortions, *id.* at 164; and (3) the Act still allowed performance of another "commonly used and generally accepted" method of abortion, *id.* at 165.

In light of this precedent, we conclude that H.B. 2's regulations on medication abortion, like the Act in *Gonzales*, do not facially require a court–imposed exception for the life and health of the woman.  First, we emphasize that the conditions that supposedly require off-label protocol have not been clearly defined.   The district court's opinion asserted that such cases include women who are "extremely obese" or who have "certain uterine anomalies." *Abbott*, 951 F. Supp. 2d at 906 n.18.  As the State argued, granting an injunction to this vague group would effectively give doctors wide latitude to prescribe the medication between 49 and 63 days LMP.  Second, although Dr. Fine baldly asserts that surgical abortion is nearly, if not actually, impossible for a particular subset of women, Planned Parenthood has not pointed this court to any evidence of scientific studies or research in the record showing this to be true.  *See Gonzales*, 550 U.S. at 162.  Moreover, there appears to be disagreement over whether medication abortions are actually safer for that

18 The petitioners in *Gonzales* offered evidence from doctors who had testified before Congress and in the lower courts that the alleged health advantages of intact D & E "were based on speculation without scientific studies to support them."  *Gonzales*, 550 U.S. at 162.

same subset of women, at least when subsequent emergency surgical abortions are necessary. Third, H.B. 2, unlike the Act in *Gonzales*, does not ban an entire abortion method. Rather, it merely shortens the window during which a woman may elect to have a medication abortion, leaving open the possibility for any woman to have a medication abortion up to forty–nine days LMP. Although Dr. Fine mentioned in passing that many women do not detect pregnancies until they are *close* to forty–nine days LMP, there is no evidence that such women are unable to obtain a medication abortion before the forty–nine day FDA–approved window closes. The district court's opinion speculated, absent any evidence, that at least some women for whom surgical abortion is contraindicated will likely not discover or choose abortion until after forty–nine days LMP. *Abbott*, 951 F. Supp. 2d at 906 n.20. Courts, however, must base decisions on facts, not hypothesis and speculation.

This brings us to our final point. The *Gonzales* court noted in closing that the respondents' facial attack on the Act should not have been entertained in the first place because "the proper means to consider exceptions is by as–applied challenge." *Gonzales*, 550 U.S. at 167. Facial challenges impose a "'heavy burden' upon the parties maintaining the suit" because there is often too little evidence to show that a particular condition has in fact occurred or is very likely to occur. *Id.* That is the case here. We follow in the Supreme Court's footsteps by noting that in an as–applied challenge, which is the proper means of challenging the lack of an exception to the regulations at issue, "the nature of the medical risk can be better quantified and balanced than in a facial attack." *Id.* As this case currently stands, H.B. 2 on its face does not impose an undue burden on the life and health of a woman, and the district court erred in finding to the contrary. We underscore that nothing in our opinion or the law as we have affirmed it detracts from *Casey*'s requirement regarding

33

No.  13-51008

abortion restrictions where the abortion is necessary to preserve the life of the mother.  *Casey*, 505 U.S. at 879.

Because the district court's opinion erred in holding that H.B. 2's rejection of the off–label protocol from fifty to sixty–three days LMP facially imposes an undue burden on the abortion rights of certain women, we need not address whether the district court enforced the injunction beyond the scope of the evidence before it.

## V.

For these reasons, the district court's judgment is REVERSED and RENDERED for the State of Texas, except that the admitting privileges requirement, § 10(b), may not be enforced against abortion providers who timely applied for admitting privileges under the statute but are awaiting a response from the hospital.