EMILIO M. GARZA, Circuit Judge,
dissenting:
The majority holds that the mere act of crossing a state border imposes an “undue burden” on a woman’s right to choose to obtain abortion services. Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Because the undue burden test requires an assessment of the difficulty of obtaining abortion services, whether in a woman’s own state or a neighboring state, and because neither the district court nor the majority has undertaken this assessment, I respectfully dissent.
A
The majority claims that “the district court found that the effect of the law would be to close the Clinic” operated by the Jackson Women’s Health Organization (“JWHO”). Ante at 452 (emphasis added).[1]
The direct, legal effect of House Bill 1390 (“H.B. 1390” or “the Act”) is only to mandate that “[a]ll physicians associated with [an] abortion facility must have admitting privileges at a local hospital_” Miss.Code Ann. § 41 — 75—1(f). Mississippi had previously required all doctors affiliated with outpatient ambulatory surgical facilities to have admitting privileges at a local hospital, but expressly exempted Level I abortion facilities, which are authorized to perform abortions after the first trimester. See Miss. Admin. Code 15-16-1:42.9.7 (2011). H.B. 1390 eliminated this exemption.[2] Because the Clinic is a Level I abortion facility, all of its doctors must obtain admitting privileges under the Act. Critically, however, the Act neither directly closes the Clinic, prevents the Clinic’s physicians from obtaining admitting privileges, nor authorizes the State to intervene in the hospitals’ decision-making.[3]
*460 Moreover, the Act, as the majority correctly holds, is amply supported by a rational basis. Ante Part IV.A. In ascertaining whether “any conceivable rationale” underlies a law, we are compelled to judge the words of the statute, not the motives of those who passed it. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 748 F.3d 583, 594 (5th Cir.2014). Such a rational basis is plainly present: The admitting-privileges requirement both strengthens regulation of the medical profession and protects maternal health. See Gonzales v. Carhart, 550 U.S. 124, 157, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (“[T]he State has a significant role to play in regulating the medical profession.”); Casey, 505 U.S. at 846, 112 S.Ct. 2791 (explaining states’ “legitimate interes[t] from the outset of the pregnancy in protecting the health of the woman”). In sum, the purpose of H.B. 1390 is to protect women seeking abortion services from the known risks of complications.[4]
The independent decisions of private hospitals have no place in our review of state action under the Constitution. Cf. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (articulating state-action requirement for § 1983 suits).[5] Here, five hospitals rejected the JWHO doctors’ applications out of hand because they performed elective abortions. As the majority notes, each of these five hospitals issued letters explaining that “[t]he nature of [the applicant’s] proposed medical practice is inconsistent with [the] Hospital’s policies and practices as concerns abortion and, in particular, elective abortions.” See ante at 450 n. 3. Federal law, however, prohibits entities receiving certain funding or contracts from discriminating “in the extension of staff or other privileges to any physician ... because he performed or assisted in the performance of a lawful sterilization procedure or abortion....” 42 U.S.C. § 300a-7(c).[6] Thus, when a state *461 affords private hospitals the authority to grant admitting privileges, those hospitals must faithfully exercise their authority in a non-discriminatory manner.[7]
Regardless of the propriety or the legality of the hospitals’ actions, what matters for this substantive due process analysis is that JWHO has not shown that the Clinic’s closure would result directly from H.B. 1390, as opposed to the independent decisions of local hospitals — non-state actors. Because JWHO failed to demonstrate that the Act could have “the effect of placing a substantial obstacle in the path of a woman’s choice” to obtain abortion services, Casey, 505 U.S. at 877, 112 S.Ct. 2791 (emphasis added), it has not shown a substantial likelihood that it will prevail on the merits.
B
Even assuming that H.B. 1390 itself would cause the Clinic to close, I would still disagree with the majority’s holding. The majority, following the lower court, holds that “the proper formulation of the undue burden analysis focuses solely on the [challenged law’s] effects within the regulating state.” Ante at 457. Accordingly, the majority concludes that H.B. 1390, which “effectively clos[es] the one abortion clinic in the state,” would impose an undue burden because Mississippi women would need to travel to a neighboring state to obtain abortion services. Id. Put differently, in the majority’s view, to require a woman to cross a state border in order to obtain abortion services would unduly burden her right to choose an abortion. I disagree.
Two errors infect the majority’s analysis — an impermissible reliance on silence and a misunderstanding of the holding of State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938). In the majority’s view, the Casey Court’s failure to “mention or consider the potential availability of abortions ... in surrounding states” implies that we must confine our undue burden analysis to Mississippi. Ante at 456.[8] Such an inference is legally nonsensical: No such rule exists. Casey dealt with the constitutionality of a Pennsylvania statute imposing various informed consent and spousal notification requirements on women seeking abortion services in that state, and the Court had no occasion to consider abortion access in nearby states. See Casey, 505 U.S. at 879-901, 112 S.Ct. 2791. The lack of a squarely applicable precedent means only that the question remains open. “In constitutional adjudication, as in the com *462 mon law, rules of law often develop incrementally as earlier decisions are applied to new factual situations.” Williams v. Taylor, 529 U.S. 362, 384-85, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Here, we are called upon to apply substantive due process principles to a novel factual situation — the closure of a state’s sole abortion provider as a result of a law regulating physician qualifications. The absence of binding authority addressing similar facts merely frees us to derive the rule of law that resolves this dispute.[9]
Of course, we do not write on a blank slate. Casey teaches that a state may regulate abortion to further its interests in protecting the health and safety of women, though “[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.” Casey, 505 U.S. at 878, 112 S.Ct. 2791. Moreover, “[t]he fact that a law which serves a valid purpose ... has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.” Id. at 874, 112 S.Ct. 2791. Applying Casey, a panel of this Court recently concluded that “an increase of travel of less than 150 miles for some women is not an undue burden-” Abbott, 748 F.3d at 598. The majority gives these binding principles a passing nod, ante at 453-54, before setting them aside for the sole reason that this case happens to involve the crossing of state borders to obtain abortion services, id. at 455 n. 6.
The majority’s second, and more grievous, error is its reliance on the wholly inapposite case of Gaines. In that equal protection case, Gaines was refused admission to the University of Missouri’s law school because he was African-American. Gaines, 305 U.S. at 343, 59 S.Ct. 232. Missouri’s statutory scheme would have provided Gaines a stipend to attend law school in a neighboring state. Rather than apply for the stipend, Gaines filed a petition for a writ of mandamus to compel the University to admit him, on the grounds that his rejection was “a denial by the State of the equal protection of the laws in violation of the Fourteenth Amendment. ...” Id. at 342, 59 S.Ct. 232. The state court denied his petition, and the Supreme Court of Missouri affirmed. Id. The Supreme Court of the United States reversed, holding that the Equal Protection Clause required Missouri, which had already established a law school, to “furnish [Gaines] within its borders facilities for legal education substantially equal to those which the State there afforded for persons of the white race....” Id. at 351, 59 S.Ct. 232.
That a state may not shift its equal protection duties to another state is “[m]anifestly” clear. Id. at 350, 59 S.Ct. 232. The text of the Equal Protection Clause requires that “[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV (emphasis added). As the Gaines Court explained, the reason for this jurisdictional qualification is ele *463 mentary: A state’s duty to give equal protection of the laws “can be performed only where its laws operate, that is, within its own jurisdiction.” Gaines, 305 U.S. at 350, 59 S.Ct. 232. The “separate responsibility” to provide equal protection falls upon each and every state “within its own sphere,” for the power of each state’s laws extends no farther. Id.
Although the correctness of Gaines’s equal protection holding is beyond question, it has no bearing on this case, which arises under the Due Process Clause. The majority concedes that “Gaines has never been cited in the abortion context.” Ante at 457. Nonetheless, the majority proceeds to transpose Gaines’s maxim that “[n]o State can be excused from performance by what another State may do or fail to do,” Gaines, 305 U.S. at 350, 59 S.Ct. 232, into a broader principle that “a state cannot lean on its sovereign neighbors to provide protection of its citizens’ federal constitutional rights,” thereby concluding that “H.B. 1390 effectively extinguishes [the abortion] right within Mississippi’s borders,” ante at 457. The majority misreads Gaines. A state’s obligation “to give the protection of equal laws” does not depend on “what another State may do or fail to do.” Gaines, 305 U.S. at 350, 59 S.Ct. 232 (emphasis added). Gaines thus governs each state’s obligations solely under the Equal Protection Clause, not under the Constitution at large, much less the substantive component of the Due Process Clause. See Ayers v. Thompson, 358 F.3d 356, 360 (5th Cir.2004) (applying Gaines’s holding that “the Fourteenth Amendment guarantees to individuals the equal protection of the laws ” (emphasis added)).
Additionally, the state’s equal protection obligation is fundamentally different from its obligation under Casey. The majority concedes that in the abortion context, “the state government is not providing any [abortion] service,” ante at 457, but fails to grasp the doctrinal consequence: The duty not to unduly burden the abortion right could never be “cast by one State upon another,” Gaines, 305 U.S. at 350, 59 S.Ct. 232, because this duty does not require a state to take any action, but rather to refrain from taking unconstitutional actions. Under the Equal Protection Clause, a state must provide equal protection of the laws whenever and wherever it enforces or provides a service under its laws. In Gaines, Missouri had to provide equal protection of its laws to Gaines in Missouri, where it had elected to offer a law school education to white students. To require Gaines to attend law school in another state would indeed cause the equal protection duty to be “cast by one State upon another.” Gaines, 305 U.S. at 350, 59 S.Ct. 232. By contrast, no state is obligated to provide or guarantee the provision of abortion services within its borders.[10] Rather, a state need only “regu-lat[e] [the] privately provided service” of abortion in accordance with the Due Process Clause, ante at 457, ensuring that its rational laws do not impose an undue burden. See Casey, 505 U.S. at 878, 112 S.Ct. 2791; Gonzales, 550 U.S. at 158, 127 S.Ct. 1610. Mississippi owes this duty to its female residents whether the Clinic is open or not. Absent any evidence and factual findings on the Act’s impact on costs and travel distances for accessing abortion services, JWHO has failed to demonstrate a substantial likelihood of proving a constitutional violation.
*464 The inapplicability of Gaines is even more apparent in light of the text of the Due Process Clause. If all states are required to refrain from unduly burdening the abortion right of “any person,” Casey, 505 U.S. at 846, 112 S.Ct. 2791 (quoting U.S. Const, amend. XIV), then it is impossible for this obligation to be “cast by one State upon another,” Gaines, 305 U.S. at 350, 59 S.Ct. 232. Here, Mississippi could not possibly “shift its obligation” under the Due Process Clause, ante at 449, because its neighboring states (and all other states) already owe the same due process obligation to “any person” — including Mississippi women.
The majority’s cited authorities do not resolve this case. Casey did not contemplate whether the availability of abortion in neighboring states affects the undue burden analysis. Similarly, Gaines stands for the uncontroversial principle that a state’s duty to provide equal protection cannot be altered by the áctions or inactions of a neighboring state. The majority sheds no light on a state’s duties under the Due Process Clause, let alone its duty to refrain from unduly burdening the right to choose an abortion.
A correct analysis under the Due Process Clause requires us to apply Casey and Abbott and consider whether the difficulty of obtaining abortion services under the facts of this case constitutes an undue burden. On this record, JWHO has not shown a substantial likelihood that any such burden actually exists — that the Act results in more than an “incidental effect of making it more difficult or more expensive to procure an abortion.” Casey, 505 U.S. at 874, 112 S.Ct. 2791. In 2011, prior to the Act’s passage, nearly sixty percent of Mississippi women who obtained abortions already traveled to other states for those services.[11] Thus, the Act would likely not impose any undue burden on their access to those very same out-of-state providers. As for women in the Jackson area, who would be most affected by the Clinic’s closure, a proper undue burden analysis must assess the costs of obtaining abortion services at the closest facility in a neighboring state. As the district court did not conduct this analysis, the question of the permissible costs or travel distance under the substantive component of the Due Process Clause is not before us on this appeal. In any event, to support its request for a preliminary injunction, JWHO had to show a substantial likelihood that these travel costs would constitute an undue burden, and it has failed to do so.[12]
The majority claims that requiring courts to examine abortion availability in other states would be “exceedingly difficult” as a practical matter. Ante at 456 n. 8. The majority cannot imagine how courts undertaking as-applied analyses could account for “the law, potential changes in the law, and locations of abortion clinics in neighboring states.” Id. This concern is unfounded. Here, the parties are fully prepared and able to develop the record concerning the presence of abortion providers in neighboring states.[13] Although *465 the majority suggests that access to these providers might change in the future, the essence of adjudication is the application of law to a set of facts at a particular point in time, regardless of how those facts might later be altered.[14] And to the extent that neighboring states’ abortion laws would be relevant at all, federal courts are more than competent to survey the laws of many or even all states.[15]
The majority also echoes the district court’s fear of a “patchwork system where constitutional rights are available in some states but not in others.” Ante at 455. The majority’s belief that the mere closure of the Clinic would abrogate the State’s obligation not to unduly burden abortion access again illustrates its misunderstanding of Gaines. See supra. Moreover, the majority has unwittingly instituted its own “patchwork system”: If all undue burden analyses must stop at state borders, the existence of an undue burden will depend, in part, on a plaintiffs location relative to those boundaries. For instance, women in northern Mississippi who live a mere fifteen miles from the heart of Memphis, Tennessee, could never enjoin the closure of the clinic in that city, lest Mississippi be “excused from [its] performance.” Gaines, 305 U.S. at 350, 59 S.Ct. 232. But women just across the border in Tennessee could do so, if they demonstrate that the closure would impose an undue burden. This result is logically and practically untenable— all the more so in regions where populations are denser and urban areas often straddle state borders. The majority’s state-by-state undue burden analysis cannot be squared with the duty of all states to refrain from unduly burdening the right of “any person” to choose an abortion. See Casey, 505 U.S. at 846, 112 S.Ct. 2791 (quoting U.S. Const, amend. XIV).
Lastly, the sole act of crossing a state border cannot, standing alone, constitute an unconstitutional undue burden on the abortion right because the Constitution envisions free mobility of persons without regard to state borders.[16] The majority’s conceptual approach runs headlong into the well-established “constitutional right to *466 travel from one State to another.” Saenz v. Roe, 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). This right arises directly from our Constitution’s goal of integrating distinct sovereigns into a single, federal polity. The Supreme Court has long “recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.” Id. at 499, 119 S.Ct. 1518 (quoting Shapiro v. Thompson, 394 U.S. 618, 629, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)).
By arbitrarily confining its undue burden analysis to Mississippi, the majority departs not only from the concept of a .constitutional right to travel, but importantly from the text “any person” in the Due Process Clause. In assessing whether a state law unduly burdens the abortion right, courts must be able to consider the availability of abortion services in neighboring states. Accordingly, I cannot conclude, as the majority does, that our analysis must “focu[s] solely on the effects within the regulating state,” ante at 457, or that JWHO has shown a substantial likelihood H.B. 1390 imposes an undue burden merely by causing women to travel to an adjacent state to obtain abortion services.
The majority concludes by denying that it establishes any per se rule. “Nothing in this opinion,” the majority declares, “should be read to hold that any law or regulation that has the effect of closing all abortion clinics in a state would inevitably fail the undue burden analysis.” Ante at 458. Attempting to narrow its holding to the specific facts of this case, the majority claims to base its holding on “the entire record and factual context in which the law operates,” including “the statutory provision in question,” “the ability of the Clinic to comply with H.B. 1390,” “the reasons cited by the hospitals for denying admitting privileges,” and the “nature and process of the admitting-privileges determination.” Id. In so doing, the majority professes to leave open the possibility that some law, such as the “hypothetical sanitation regulation” discussed in the State’s briefing, could cause the closure of all abortion providers within a state and yet still be constitutional. Id. at 457-58.
The majority’s attempt to cabin its holding to the facts of this case betrays its awareness that crossing Mississippi’s borders cannot be dispositive. Yet notwithstanding this attempt, today’s opinion concludes in no uncertain terms: “Gaines instructs us to consider the effects of H.B. 1390 only within Mississippi in conducting an undue burden analysis.” Id. at 458-59. The majority simply cannot have it both ways. So long as the undue burden analysis is confined by Mississippi’s borders, the closure of that state’s sole abortion provider must be an undue burden.[17]
Even accepting that the majority’s factors somehow narrow its holding, I find its ad hoc approach to be unworkable. The majority does not even attempt to explain how this case’s “factual context,” the “statutory provision” at issue, and the “nature and process” of the admitting-privileges requirement purportedly combine to make this burden “undue.”[18] Ante at 458. The *467 message for future courts and litigants is that a law causing the closure of all abortion providers in a state imposes an undue burden — unless it does not impose such a burden. The use of such an unprincipled approach to strike down as unconstitutional a state’s exercise of its sovereign power to protect its citizens is particularly troubling.
Lastly, certain factors by which the majority purports to narrow its approach undermine its holding as to the Act’s rational basis. As already explained, I fully join in the majority’s conclusion that H.B. 1390 has a rational basis. See supra Part A; ante Part IY.A. Yet the majority, by faulting the “statutory provision” and the “nature and process of the admitting-privileges determination,” without any explanation, in essence mounts a back-door attack on the purpose of H.B. 1390. Ante at 458.[19] And to the extent that the majority’s litany of factors is an indictment of the local hospitals for their improper discrimination,[20] it is those hospitals — not the State or H.B. 1390 — that should be held accountable. See supra Part A.
Despite the majority’s attempt to narrow its reasoning, today’s opinion can only be read to mean that a law or regulation causing all of a state’s abortion providers to close, such that women must cross a state border to obtain abortion services, imposes an unconstitutional undue burden on the abortion right.
C
The majority reminds us that “the Supreme Court long ago determined that the Constitution protects a woman’s right to choose an abortion-” Ante at 449. We are then reminded that “the right to an abortion was found in the penumbras of the Constitution....” Id. at 449. Proceeding further, and following the Supreme Court’s direction, the majority relies on Casey for its “undue burden” test. Id. at 453.[21]
In addition to announcing the undue burden standard, however, Casey also advanced a new interpretation of substantive due process by which the judiciary can now interpret the “full scope of the liberty guaranteed by the Due Process Clause.” Casey, 505 U.S. at 848, 112 S.Ct. 2791 (quoting Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)). In taking blockquotes from Justice Harlan’s dissent in Poe v. Ullman to explain its new theory, see Casey, 505 U.S. at 848-50, 112 S.Ct. 2791, the
*468 Casey joint opinion notably omitted portions capturing the full extent of his departure from the Constitution’s text:
[T]he imperative character of Constitutional provisions ... must be discerned from a particular provision’s larger context. And inasmuch as this context is one not of words, but of history and purposes, the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution.
Poe, 367 U.S. at 542-43, 81 S.Ct. 1752 (Harlan, J., dissenting).[22] We now follow Justice Harlan: Interpretation in this “larger context” is an enterprise “not of words, but of history and purposes.” Id. Importantly, “history” and “purposes”— severed from the words of the Constitution and the explicit guarantees they provide— have either no definite meaning or, even more conveniently for some, any desired meaning whatsoever. History, purpose, and tradition are not legal concepts; rather, they are elements of a new political lexicon. In this, the will of the People, as expressed in their written Constitution, gives way to the political choices of the judiciary.[23]
Consistent with its substantive due process theory, Casey gives full play to political preferences in its “undue burden” standard. By defining in circular fashion an “undue burden” as a “substantial obstacle,” Casey, 505 U.S. at 878, 112 S.Ct. 2791, the Casey joint opinion’s “verbal shell game ... conceal[s] raw judicial policy choices concerning what is ‘appropriate’ abortion legislation,” id. at 987, 112 S.Ct. 2791 (Scalia, J., concurring in the judgment in part and dissenting in part). At bottom, because Casey’s “undue burden” is a standard-less standard, a “concept [that] has no principled or coherent legal basis,” courts are left to their own devices. Id. Yet even under Casey, our judicial discretion is not totally unfettered. Here, the text of the Due Process Clause and the fundamental constitutional right to travel demonstrate that courts must not stop the undue burden analysis at state borders, without considering access to abortion services in neighboring states. But the fact that the majority disagrees, fabricates new rules from Casey’s silence, and overextends Gaines — an equal protection case— evinces Casey’s ultimate failure to explain when a burden is “undue.” In the end, under Casey, the majority’s maneuvers are not legal, but political.
*469 Worse still, Casey allows judicial policy choices to be cloaked in the specific facts of any given case. The Casey decision, by limiting its assessment of the Pennsylvania abortion statute to the “evidence on th[e] record” without explaining the legal significance of particular facts, id. at 884, 112 S.Ct. 2791, rendered itself wholly mi gen-eris, bound to that record and incapable of establishing any “generally applicable principle,” id. at 988, 112 S.Ct. 2791 (Sca-lia, J., concurring in the judgment in part and dissenting in part).[24] Like the Casey joint opinion, the majority here claims that its holding depends on a meandering list of factors “including, but not limited to,” certain facts present in this case. Ante at 458. In this way, the majority purports to hold that while the closure of all abortion providers in a state is not necessarily unconstitutional, the burden created by H.B. 1390 in Mississippi simply happens to be “undue.” Id. Casey’s logic is perverse indeed; Courts can make policy decisions about which abortion restrictions are “undue,” and then escape any jurisprudential ramifications of those decisions by taking refuge in the purportedly distinct factual context of that particular application.
By its jarring opinion, the majority has affirmed the district court’s decision to enjoin enforcement of H.B. 1390, enacted by the Mississippi legislature — the people’s elected representatives — -to regulate physicians’ services. That this injunction flows from the policy choices of judges, who must fill the vacuum that is now the Due Process Clause’s “liberty’ interest, is a profoundly troubling consequence of current constitutional jurisprudence under Casey.[25]
*470 “[T]he boundaries of substantive due process are less than pellucid,” and even the Supreme Court has “had difficulty in fixing [the] outer perimeter” of these rights. Causeway Med. Suite v. Ieyoub, 109 F.3d 1096, 1115 (5th Cir.1997) (Garza, J., specially concurring). We here confront the quandary of “boundaries” and “perimeters” in a starkly literal sense— under Casey, how far is too far to travel to an abortion clinic?
Ultimately, I await a return to legal theory that recognizes principled limits.[26] Even the majority accepts that the “controversy [over the scope of the abortion right] seems to have no end.... ” Ante at 453. But in the absence of meaningful guidance from Casey and its progeny, the solution cannot be what the majority has proffered. Here, JWHO has not shown that the Clinic’s closure would be the direct effect of H.B. 1390, given the independent decisions of the local hospitals. And even if causation were established, because merely crossing a state line would not constitute an undue burden, closure of the only abortion provider in Mississippi would not necessarily be unconstitutional; the district court failed to make findings about abortion access in neighboring states. Accordingly, because JWHO has not demonstrated a substantial likelihood of success on the merits, I would vacate the preliminary injunction.
Respectfully, I dissent.

.Preliminarily, the district court made no such finding. The district court found only that "the State has essentially confirmed that it will revoke the Clinic’s license....” The undisputed fact that the Clinic's closure was imminent, see ante Part III, says nothing about the legal cause of such closure. Even if the district court implicitly found that House Bill 1390 would cause the Clinic's closure, the majority errs in relying on this finding because it is not supported by this record, notwithstanding any concerns about waiver, ante at 452 n. 4. See Century Marine Inc. v. United States, 153 F.3d 225, 231 (5th Cir.1998) ("[T]he reviewing court may assume that the [lower] court impliedly made a finding consistent with its general holding so long as the implied finding is supported by the evidence.” (emphasis added)).

. JWHO does not challenge the admitting-privileges requirement on procedural due process grounds, and in any event, Abbott has foreclosed such an argument. See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 748 F.3d 583, 600 (5th Cir.2014) (citing Women’s Health Ctr. of West Cnty., Inc. v. Webster, 871 F.2d 1377, 1382 (8th Cir.1989)).

. Also unchanged by H.B. 1390 is the authority of hospital officials to "evaluate the professional competence of ... applicants for medical staff membership and/or clinical *460 privileges.” Miss. Admin. Code 15 — 16— 1:41.6.6.

.The Abbott panel concluded that Casey’s "purpose” prong remains an independent inquiry, and we are bound by that prior panel's decision. See Abbott, 748 F.3d at 590 ("In Gonzales, the Court added that abortion restrictions must also pass rational basis review.” (emphasis added)); ante at 453 (explaining that rational basis review functions as a third inquiry “in addition” to Casey's two-part test of whether the challenged law has a purpose or effect of imposing an undue burden). However, in my view, Gonzales v. Carhart re-stated Casey's purpose inquiry as rational basis review. See Gonzales, 550 U.S. at 156-60, 127 S.Ct. 1610 (concluding that purpose of ban on particular abortion method was not to impose an undue burden on abortion right because state has "a rational basis to act”). Thus, after Gonzales, the undue burden test consists of two (and not three) inquiries — whether the challenged law has a rational basis and whether it has the effect of imposing an undue burden on the abortion right. See Planned Parenthood of Wis. v. Van Hollen, 738 F.3d 786, 799 (7th Cir.2013) (Manion, J., concurring in part and in the judgment) (stating "two-part test”).

. Under Lugar's two-part test for determining whether a deprivation of a federal right is fairly attributable to the state, (1) "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible”; and (2) "the party charged with the deprivation must be a person who may fairly be said to be a state actor,” and "[t]his may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.” Ballard v. Wall, 413 F.3d 510, 518 (5th Cir.2005) (quoting Lugar, 457 U.S. at 937, 102 S.Ct. 2744).

. By contrast, Mississippi law protects only physicians who choose not to perform abortions, not those who do. See Miss.Code Ann. § 41-107-7(3) ("It shall be unlawful for any person, public or private institution, or public official to discriminate against any health care institution, or any person, association, corporation, or other entity ... in any man *461 ner, including ... any denial ... [of] staff privileges ... because such health care institution, or person, association, or corporation ... declines to participate in a health care service which violates the health care institution's conscience.” (emphasis added)).

. The Second Circuit has held that this statutory provision does not imply a private right of action. See Cenzon-DeCarlo v. Mount Sinai Hosp., 626 F.3d 695, 698-99 (2d Cir.2010). However, if the hospitals are indeed entities covered under 42 U.S.C. § 300a-7(c), JWHO would likely have a remedy under 42 U.S.C. § 1983 for a violation of its statutory right to be free from discrimination in seeking admitting privileges. See Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (holding that because § 1983 by its plain text "broadly encompasses violations of federal statutory - as well as constitutional law,” plaintiffs could bring suit for violation of Social Security Act); Banks v. Dallas Hous. Auth., 271 F.3d 605, 609 (5th Cir.2001) (explaining that § 1983 suits alleging violation of federal statute must be for "violation of a federal right, not merely a violation of federal law " and applying three-factor test for determining existence of "right” (quoting Blessing v. Freestone, 520 U.S. 329, 340-41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997))).

. See also ante at 14 (explaining that "other courts, in striking down abortion regulations, have failed to consider the availability of abortions in neighboring states”).

. The majority discusses certain language in Okpalobi v. Foster, 190 F.3d 337 (5th Cir.1999), suggesting that a law’s closure of all of a state's abortion providers would constitute an undue burden. But as the majority acknowledges (and as the district court, too, recognized), that panel opinion was later vacated in its entirety by the en banc court for lack of Article III jurisdiction and is therefore not binding precedent. See ante at 456 n. 7 cting Okpalobi v. Foster, 244 F.3d 405 (5th Cir.2001) (en banc)). Similarly, to the extent that the Tenth Circuit decision in Jane L. v. Bangerter, 102 F.3d 1112 (10th Cir.1996), stands for the proposition that causing women to leave the state to obtain abortion services imposes an undue burden, see ante at 455-57, that decision does not bind us, and I find it unpersuasive for the reasons explained below.

. See Casey, 505 U.S. at 887, 112 S.Ct. 2791 ("Even the broadest reading of Roe, however, has not suggested that there is a constitutional right to abortion on demand. Rather, the right protected by Roe is a right to decide to terminate a pregnancy free of undue interference by the State.” (citation omitted)).

. Mississippi State Department of Health statistics show that in 2011, Mississippi women obtained 3,188 abortions in other states and only 2,224 abortions in Mississippi. See Defs.’ Resp. Opp’n Pis.’ Second Mot. Prelim. Inj. at 24 n.27.

. The district court did not make findings on the distance that Mississippi women would need to travel or costs they would incur to obtain an abortion in a neighboring state following the Clinic’s potential closure; instead, the district court concluded, as the majority does as well, that the closure of a state's only abortion provider would be a per se undue burden.

.The State has already submitted data on distances from Jackson to abortion facilities in West Monroe, Louisiana (121 miles); Tuscaloosa, Alabama (185 miles); Baton Rouge, Louisiana (174 miles); and Memphis, Tennessee (209 miles). See Defs.’ Resp. Opp’n Pis.’ Second Mot. Prelim. Inj. at 24 n.27.

.Cf. Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 72, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("The basic rationale behind our ripeness doctrine is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements, when those disagreements are premised on contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks and citation omitted)). Furthermore, as discussed above, because all states owe due process obligations to “any person,” without regard to state borders, if a neighboring state is later poised to close an abortion provider upon which a Mississippi woman relies, she could sue to enjoin that closure. See Ex parte Young, 209 U.S. 123, 129, 149, 155-56, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that citizens of Iowa and Wisconsin could bring suit to enjoin Minnesota officials from enforcing state law setting railroad rates that allegedly deprived them of property without due process of law). For the same reason, there is no basis for JWHO’s fear of a "domino effect,” in which a state closes all in-state abortion facilities in reliance on an adjacent state's facilities, only to prompt that adjacent state to do the same in reliance on abortion availability in a third state.

. See, e.g., SMI Owen Steel Co., Inc. v. Marsh USA, Inc., 520 F.3d 432, 437 (5th Cir.2008) ("In making the Erie guess, we may consider, among other sources, treatises, decisions from other jurisdictions, and the 'majority rule.’ ”); Nijhawan v. Holder, 557 U.S. 29, 39-40, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009) (opting to apply circumstance-specific approach to federal aggravated felony fraud provision when only eight states had fraud statutes with a monetary threshold consistent with that of the federal offense, such that categorical approach would result in "limited and ... haphazard” application of federal statute).

. See Van Hollen, 738 F.3d at 805 n. 9 ("In our economy, crossing state lines to obtain services at a nearby urban center is common. Thus, state lines are unlikely to affect a woman's decision about where to get an abortion and the availability of abortion at out-of-state clinics should be considered in the undue *466 burden analysis.”) (Manion, J., concurring in part and in the judgment).

. To be sure, this case involves JWHO’s as-applied challenge to H.B. 1390. But as-applied challenges still establish important rules of law, and the majority attempts to obscure the necessary implications of its own rule.

. Tellingly, at oral argument, when JWHO was asked to clarify how courts should assess whether the closure of a state's only abortion *467 clinic due to a "valid regulation” constitutes an undue burden, JWHO's perfectly tautological suggestion was to apply the "undue burden” test. The majority apparently agrees.

. The question of whether H.B. 1390 has a purpose of imposing an undue burden (under Abbott, a question distinct from the rational basis inquiry, see supra note 4) is not before us on this appeal, and the district court made no relevant factual findings. If, in the majority’s view, ascertaining the Act’s purpose is indeed so crucial, then for this reason alone, vacatur is proper.

. The majority claims to base its holding on certain facts that seem to implicate the local hospitals’ actions, including "the ability of the Clinic to comply with H.B. 1390, Dr. Parker’s and Dr. Doe’s efforts to obtain admitting privileges, the reasons cited by the hospitals for denying admitting privileges to Dr. Parker and Dr. Doe, [and] the absence of a Mississippi law prohibiting hospitals from discriminating against physicians who perform abortions when granting admitting privileges....” Ante at 458.

.To support its theory of unenumerated substantive due process rights, the Casey joint opinion shifted the underlying theory from a right of privacy, see Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to a substantive due process liberty interest as originally articulated by Justice Harlan in his dissent in Poe v. Ullman, 367 U.S. 497, 542-43, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).

. In concluding, the Casey joint opinion likewise concedes that it is unconstrained by the niceties of constitutional text, explaining that "[e]ach generation must learn anew that the Constitution’s written terms embody ideas and aspirations that must survive more ages than one.” Casey, 505 U.S. at 901, 112 S.Ct. 2791 (emphasis added). Compare Casey, 505 U.S. at 849, 112 S.Ct. 2791 ("[A]djudication of substantive due process claims may call upon the Court ... to exercise ... reasoned judgment.”); id. at 896, 112 S.Ct. 2791 (describing undue burden standard as "inherently manipulable”) (Scalia, J., concurring in the judgment in part and dissenting in part), with Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803) ("That [an attempt to uphold a law notwithstanding an express constitutional prohibition] thus reduces to nothing what we have deemed the greatest improvement on political institutions — a written constitution — would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction.” (emphasis added)); id. at 176 ("That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected.” (emphasis added)).

. "The absolute is not attained nor, above all, created through history.... History can then no longer be presented as an object of worship.” Albert Camus, The Rebel: An Essay on Man in Revolt 302 (Anthony Bower trans., Vintage Books 1956) (1951).

. See also Casey, 505 U.S. at 887, 112 S.Ct. 2791 ("[0]n the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting period constitutes an undue burden.” (emphasis added)); id. at 901, 112 S.Ct. 2791 (“While at some point increased cost [resulting from recordkeeping and reporting requirements of the challenged statute] could become a substantial obstacle, there is no such showing on the record before us.” (emphasis added)); id. at 991-92, 112 S.Ct 2791 ("[T]he approach of the joint opinion is, for the most part, simply to highlight certain facts in the record that apparently strike the three Justices as particularly significant in establishing (or refuting) the existence of an undue burden; after describing these facts, the opinion then simply announces that the provision either does or does not impose a substantial obstacle’ or an ‘undue burden.' We do not know whether the same conclusions could have been reached on a different record, or in what respects the record would have had to differ before an opposite conclusion would have been appropriate.” (citations omitted)) (Sca-lia, J., concurring in the judgment in part and dissenting in part).

. Professor Hamburger has commented on this aggrandizement of judicial power:
[M]any Americans, in their desire to prevent the people from abusing the power above law, have invited their judges to exercise it.... [N]ot unlike some kings and Parliament when they claimed to be the final arbiter, American judges have acquired a taste for power above the law. Perhaps every society needs this sort of power, but in denying absolute power to Parliament, Americans did not give it to the judges, and although it is questionable whether the people, being merely human, will always act wisely and justly in exercising their power above the law of the land, it is even more doubtful whether the judges or any other persons in government can be trusted with such a power. Men will ever be discontent with law and ambitious for power, and judges will ever be vain enough to aspire to a justice above human law, but it is therefore all the more important for judges to recall the common law ideals of law and judicial duty.
Philip Hamburger, Law and Judicial Duty 620-21 (2008), accord Emilio M. Garza, Judicial Duty and the Future: Two Issues of Fundamental Law, 6 J.L. Phil. & Culture 147, 156 (2011).

. Government must be guided by "thought that recognizes limits." Camus, supra note 23, at 294. Moreover, when a representative government subverts the Constitution, it runs the risk of being superseded by a new (and potentially less representative) government. See Eric Voegelin, The New Science of Politics 49 (1952). The Supreme Court has subjected substantive due process theory only to the "[ajppropriate limits” of "respect for the teachings of history" and “solid recognition of the basic values that underlie our society,” which in practice are not limits at all. Moore v. City of E. Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Powell, J.) (citation omitted).