MANION, Circuit Judge,
dissenting.
In June 2013, the Wisconsin legislature introduced a statute requiring abortion *923 doctors to have admitting privileges at a nearby hospital. The statute was signed into law the following month, and the plaintiffs obtained a preliminary injunction from the district court, which we affirmed. Planned Parenthood of Wis., Inc. v. Van Hollen, 738 F.3d 786 (7th Cir.2013). The district court then granted a permanent injunction on the merits, finding that the admitting-privileges requirement unconstitutionally infringed on a woman’s right to abortion. Planned Parenthood of Wis., Inc. v. Van Hollen, 94 F.Supp.3d 949 (W.D.Wis.2015). Relying on the novel legal standard crafted by the majority in Van Hollen, the district court reached this result by shifting the burden onto the state to adduce empirical evidence justifying the rationality of its regulation. Id. at 962-64. This was error. Under well-established Supreme Court precedent, the state may constitutionally regulate abortion so long as it has a rational basis to act and does not impose an undue burden. Gonzales v. Carhart, 550 U.S. 124, 158, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Because Wisconsin’s admitting-privileges requirement satisfies this standard, I dissent.
I
Between 2009 and 2013, at least nineteen women who sought abortions at Planned Parenthood clinics in Wisconsin subsequently received hospital treatment for abortion-related complications.[1] Surely, no reasonable patient considering a medical procedure known to result in complications — potentially even death — would regard state measures designed to minimize those risks as an imposition on her constitutional rights. After all, patients are more likely to undergo medical procedures when they know that discrete measures have been taken by the state to reduce the likelihood of harm. Recognizing these basic facts, the four other federal appellate circuits that have examined similar admitting-privilege requirements have found or assumed a rational basis for them. This is such common sense that it would scarcely warrant mention in any other context. But this case involves abortion, so all bets are off.
Safety is not a negligible concern in any field of healthcare. Abortion — which is subject to less regulatory oversight than almost any other area of medicine — bears no exception. When we first reviewed Wisconsin’s admitting-privileges requirement, my concurrence cited numerous examples of egregious “abortion care” in states across the nation. One article detailed the practices at former abortionist Kermit Gosnell’s clinic in Pennsylvania, which included unlicensed personnel conducting gynecological examinations and administering painkillers. These practices resulted in the death of a patient named Karnamaya Mongar, who died after being given an overdose of anesthesia and pain medication. Media reports also circulated that Dr. Gosnell physically assaulted and performed a forced abortion on a minor and left fetal remains in a woman’s uterus, causing her excruciating pain.
*924 Dr. Gosnell was ultimately convicted of murder for the deaths of three infants delivered alive but subsequently killed at his clinic. In light of the nationwide attention that Dr. Gosnell’s shop of horrors attracted, the Wisconsin State Assembly acted swiftly to pass Act 87, including the admitting-privileges requirement at issue, in order to protect the health and safety of pregnant women who have chosen an abortion. This lawsuit followed.
Dr. Gosnell was able to run his operation in a regulatory vacuum derived in no small part from the view held by some that any regulation upon his practice was a threat to the constitutional rights of his patients. Although we have recognized that doctors may bring suit on behalf of their abortion patients, it does not automatically follow that doctors and patients have identical interests. The constitutional right to privacy exists across the spectrum of medical procedures, yet in no other area of medicine may a doctor bring a suit on behalf of a patient solely because the doctor finds a safety regulation cumbersome. Where state regulation imposes on doctors measures designed to improve patient safety, doctor-patient interests may diverge. Because that is precisely the case in this instance, we must look to the regulation’s effect on the prospective patient, not to the inconvenience the regulation presents to the abortionist.
Rather than shift the burden to the state to provide reasons it was justified to enact the law at issue, we are obligated to uphold a law that regulates abortion where there is a rational basis to act so long as the law does not have the effect of imposing an undue burden on a woman’s ability to make the decision to choose abortion. Here, the court sets this burden of proof exactly backwards. Because Wisconsin’s admitting-privileges requirement protects the health and safety of pregnant women and does not constitute an undue burden under Casey, I would join the Fifth Circuit’s merits decision in Planned Parenthood of Greater Texas Surgical Health Services v. Abbott, 748 F.3d 583 (5th Cir.2014), reh’g en banc denied, 769 F.3d 330 (5th Cir.2014) (Abbott II), which upheld a functionally identical law on similar facts. All of these facts lead me to the conclusion that the judgment of the district court should be reversed. For the reasons that follow, I dissent.
II
A. Wisconsin has a Rational Basis to protect the health and safety of pregnant women seeking an abortion.
The Supreme Court’s surviving abortion cases have. repeatedly affirmed that the state has a substantial interest in regulating abortion in furtherance of its interests in promoting the health and safety of pregnant women. See, e.g., Gonzales v. Carhart, 550 U.S. 124, 158, 163, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007); Stenberg v. Carhart, 530 U.S. 914, 931, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); Mazurek v. Armstrong, 520 U.S. 968, 973, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 846, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality); Roe v. Wade, 410 U.S. 113, 150, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). So have ours. See, e.g., Karlin v. Foust, 188 F.3d 446, 478 (7th Cir.1999); Planned Parenthood of Wis. v. Doyle, 162 F.3d 463, 467 (7th Cir.1998).
Although the court purports to be consistent with these cases, in reality, its decision undermines the state’s interest recognized within them. By doing so, the court sets a dangerous precedent that jeopardizes the ability of states to enact laws designed to curb risks to the safety and *925 welfare of patients who choose to undergo invasive medical procedures — including the women whom this admitting-privileges law protects. A brief reminder of the Supreme Court’s repeated emphasis on the state’s interest in protecting the health and safety of pregnant women who have chosen abortion is apparently necessary.
B. The Supreme Court’s abortion decisions
In Roe, the Court recognized that a state has a “legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.” Roe, 410 U.S. at 150, 93 S.Ct. 705. The Court concluded that the state’s legitimate interest in regulating abortion to protect maternal health “obviously extends at least to [regulating] the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that may arise.” Id. Roe left no doubt that the state “may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.” Id. at 163, 93 S.Ct. 705.
In Casey, the Court abandoned Roe’s rigid trimester framework. Casey, 505 U.S. at 872-76, 112 S.Ct. 2791. But not before reiterating that “the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.” Id. at 846, 112 S.Ct. 2791. Further, the Court added'that, “[a]s with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion.” Id. at 878, 112 S.Ct. 2791.
Five years later, in Mazurek, the Court rejected a challenge brought by abortion providers to a state law that restricted the provision of abortions only to licensed physicians. Mazurek, 520 U.S. at 976, 117 S.Ct. 1865. By so ruling, the Court recalled that its “cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals.” Id. at 973, 117 S.Ct. 1865 (citation omitted).
Shortly thereafter, in Stenberg, the Court underscored Roe and Casey’s commitment to the health and safety of pregnant women by striking down a federal law that made partial-birth abortion illegal because it failed to contain a “health exception ... ‘for the preservation of the life or health of the mother.’ ” Stenberg, 530 U.S. at 938, 120 S.Ct. 2597 (citation omitted). In laying the foundation for its decision, the Court first recalled that it has “repeatedly invalidated statutes that in the process of regulating the methods of abortion, imposed significant health risks.” Id. at 931, 120 S.Ct. 2597 (emphasis omitted). Channeling Casey, the Court then summarized the state’s interest in the health of pregnant women as follows: “ ‘where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother,’ [] this Court has made clear that a State may promote but not endanger a woman’s health when it regulates the methods of abortion.” Id. (citations omitted).
Most recently, in Gonzales, the Court consolidated these principles, acknowledging that “[w]here it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power” to regulate abortion. Gonzales 550 U.S. at 158, 127 S.Ct. 1610. Gonzales held that state and federal lawmakers have “wide discretion to pass legislation in areas where there is medical and scientific uncertainty.” Id. at 163, 127 S.Ct. 1610 (cita *926 tions omitted). In short, over four decades of Supreme Court decisions establish that the state has a legitimate interest in promoting the health and safety of pregnant women seeking an abortion.
C. The court splits with four federal appellate circuits.
Mindful of the health and safety interests recognized in these decisions, Wisconsin and eleven other states have passed admitting-privilege laws. Planned Parenthood of Wis. v. Van Hollen, 738 F.3d 786, 791 (7th Cir.2013). Lawsuits initiated by abortion providers followed, and multiple circuits have ruled on their constitutionality. The rationales deployed in these decisions have varied, but two facts are common throughout. First, every circuit to rule on similar admitting-privileges laws like the one at issue here has uniformly upheld them. Second, no circuit except ours has ventured anywhere close to adopting the extreme position taken by the court that a state’s admitting-privileges law lacks a rational basis. See Whole Women’s Health v. Cole, 790 F.3d 563, 584 (5th Cir.2015) (plaintiffs challenging Texas’s admitting-privileges law concede it is supported by a rational basis); Jackson Women’s Health Org. v. Currier, 760 F.3d 448, 454 (5th Cir.2014) (“H.B. 1390 satisfies rational basis review based upon our binding precedent in Abbott.”)-, Planned Parenthood of Ariz., Inc. v. Humble, 753 F.3d 905, 914 (9th Cir.2014) (“We assume without deciding that the Arizona law passes rational-basis review.”); Abbott II, 748 F.3d at 595 (“Applying the rational basis test correctly, we have to conclude that the State acted within its prerogative to regulate the medical profession by heeding these patient-centered concerns and requiring abortion practitioners to obtain admitting privileges at a nearby hospital.”); Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406, 411 (5th Cir.2013) (Abbott I) (“The State offered more than a conceivable state of facts that could provide a rational basis for requiring abortion physicians to have hospital admission privileges.”) (footnote and internal marks omitted); Greenville Women’s Clinic v. Comm’r, S.C. Dep’t of Health & Envtl. Control, 317 F.3d 357, 363 (4th Cir.2002) (“These requirements of having admitting privileges at local hospitals and referral arrangements with local experts are so obviously beneficial to patients.”) (citations omitted); Women’s Health Ctr. of W. Cty., Inc. v. Webster, 871 F.2d 1377, 1381 (8th Cir.1989) (‘We have no difficulty in concluding that [the admitting-privileges law] rationally relates to the state’s legitimate interest in ensuring that prompt backup care is available to patients who undergo abortions in outpatient clinics.”).
The rational basis standard is no stranger to the judiciary. Federal courts across the nation apply^ it regularly when constitutional challenges are brought against state action. Familiar as it may be, the district court failed to apply it, proceeding instead as though the state bore the burden of proving that its admitting-privileges law was reasonably related to the health and safety of women seeking abortions. Van Hollen, 94 F.Supp.3d at 964 (“Since the State contends that the admitting privileges requirement at issue is reasonably directed to the health of women seeking abortions, it has the burden of demonstrating this link.”) (citations omitted).
That’s exactly backwards. Under rational basis review, courts must presume that the law in question is valid and uphold it so long as the law is rationally related to a legitimate state interest. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Since the Supreme Court has repeatedly recognized the state’s long *927 standing interest in protecting the 'health and safety of pregnant women who have chosen abortion, at this juncture, “we must presume that the admitting-privileges requirement is constitutional, and uphold it so long as the requirement is rationally related to Wisconsin’s legitimate interests.” Van Rollen, 738 F.3d at 800 (Manion, J., concurring in part and in the judgment) (citations omitted). The party challenging an abortion restriction bears the burden of proving the government’s action irrational. See Mazurek, 520 U.S. at 971, 117 S.Ct. 1865 (citing Casey, 505 U.S. at 884, 112 S.Ct. 2791). To prove a legislative act irrational, “the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it.” Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citation omitted). This is a tall order because “the government may defend the rationality of its action on any ground it can muster.” RJB Props., Inc. v. Bd. of Educ. of Chic., 468 F.3d 1005, 1010 (7th Cir.2006) (citation and internal marks omitted).
Thus, the inquiry for courts under rational basis review starts with this question: is there “any reasonably conceivable state of facts that could provide a rational basis” for the state regulation? See F.C.C. v. Beach Commc’ns, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); Abbott I, 734 F.3d at 411. As demonstrated above, the answer to that question is yes. So the next question to ask is whether-the state’s means of promoting its regulation (admitting privileges) are reasonably related to the legitimate interest already established (patient safety). If that answer is also yes, then the regulation satisfies rational basis review, and we must uphold it. That the controversy implicates abortion does not alter the analysis because “[njothing in the Supreme Court’s abortion jurisprudence deviates from the essential attributes of the rational basis test, which affirms a vital principle of democratic self-government.” Abbott II, 748 F.3d at 594.[2]
D. Admitting privileges further Wisconsin’s legitimate state interest in patient safety.
Admitting privileges are, in the words of the Fourth Circuit, “obviously beneficial.” Greenville Women’s Clinic, 317 F.3d at 363 (citation omitted). So beneficial, in fact, that the National Abortion Federation recommended them until only recently. At trial, Wisconsin’s expert, Dr. James Anderson, Clinical Professor in the Department of Family Practice & Population Health at Virginia Commonwealth University School of Medicine, referenced a publication from the National Abortion Federation entitled Having an Abortion? Your Guide to Good Care (2000), which states that “[i]n the case of emergency, the doc *928 tor should be able to admit patients to a nearby hospital (no more than 20 minutes away).” Dkt. 244 at 237-40; Dkt. 126 ¶¶ 6-7.
Indeed, the medical community has long been of the opinion that admitting privileges provide a real benefit to the health and safety of pregnant women seeking an abortion. In 2003, the American College of Surgeons issued a statement on patient-safety principles that was joined by the American Medical Association and the American College of Obstetricians and Gynecologists. They listed several “core principles,” the fourth of which provided that: “[pjhysicians performing office-based surgery must have admitting privileges at a nearby hospital, a transfer agreement with another physician who has admitting privileges at a nearby hospital, or maintain an emergency transfer agreement with a nearby hospital.”[3]
Perplexingly, in this case, the AMA and ACOG have filed a joint amicus brief arguing that Wisconsin’s admitting-privileges law is unconstitutional. Yet their brief makes no mention of their 2003 statement or their sudden, yet convenient, disavowal of one of their “core principles” related to patient safety. It appears from the trial testimony that plaintiff-doctors have simply decided that admitting privileges are only desirable insofar as they do not cause members of their guild to become ineligible to perform abortions.
Abbott II also supports this conclusion. There, the court observed that “[tjhere are four main benefits supporting the requirement that operating surgeons hold local hospital admitting and staff privileges: (a) it provides a more thorough evaluation mechanism of physician competency which better protects patient safety; (b) it acknowledges and enables the importance of continuity of care; (c) it enhances inter-physician communication and optimizes patient information transfer and complication management; and (d) it supports the ethical duty of care for the operating physician to prevent patient abandonment.” Abbott II, 748 F.3d at 592. Here, the parties have consolidated these four categories of benefits into three. The trial record contains evidence that admitting privileges are rationally related to a legitimate state interest because they promote the health and safety of pregnant women seeking abortions in Wisconsin.[4] Therefore, at the first step of the Gonzales test, this requirement is subject to rational basis review. I address each benefit in turn.
i Continuity of care
Continuity of care is beneficial to abortion patients because it reduces the “risk of injury caused by miscommunication and *929 misdiagnosis when a patient is transferred from one health care provider to another.” Abbott II, 748 F.3d at 595. Indeed, even plaintiff and expert witness Dr. Kathy King of Planned Parenthood agreed that continuity of care is a necessary ingredient when treating patients. Dkt. 243 at 155.
Dr. King’s opinion was shared by the court-appointed expert, Dr. Serdar Bulun, Chair of the Department of Obstetrics and Gynecology at Northwestern University’s Feinberg School of Medicine, who also opined that “physician to physician communication is one of the most important requirements for optimal handling of a complication arising from a procedure,” and that “communication should ideally take place between the physician performing the abortion and the physician at the hospital, who will be handling the complication.” 7th Cir. Dkt. 44 at 4.[5] Dr. Bulun testified further that admitting privileges would have benefits “probably 90% of the time,” Diet. 244 at 60, and that while transfer agreements were important, “in an ideal world both [admitting privileges and transfer agreements] should exist.” Id. at 61.
Likewise, Wisconsin’s experts, including Dr. Anderson and Dr. John Thorp (a board-certified ob-gyn who teaches at the University of North Carolina’s School of Public Health), opined that admitting privileges aided in promoting continuity of care. Id. at 233 (Dr. Anderson); Dkt. 131 ¶ 22 & Dkt. 164 ¶ 15 (Dr. Thorp).
The opinions of these medical professionals are shared, too, by the Fifth Circuit, which concluded that “[requiring abortion providers to have admitting privileges would also promote the continuity of care in all cases, reducing the risk of injury caused by miscommunication and misdiagnosis when a patient is transferred from one health care provider to another.” Abbott II, 748 F.3d at 595.

ii Credentialing

Similarly, the “credentialing process entailed in the regulation reduces the risk that abortion patients will be subjected to woefully inadequate treatment.” Id. In other words, credentialing advances the state’s interest in promoting patient health by helping ensure that doctors performing abortions are qualified. Dr. Geoffrey R. Keyes, president of the American Association for Accreditation of Ambulatory Surgery Facilities, opined that “credentialing and privileging serve important and necessary functions in contemporary medical practice, primarily to ensure that patients receive safe high quality care from providers with appropriate skill, training and experience.” Dkt. 127 ¶ 15.
In addition to the testimony of Dr. Anderson, Dkt. 244 at 232-33, Dr. Bulun opined that a benefit of physicians having admitting privileges is “to ensure that the *930 practicing physicians are appropriately qualified, trained and competent to practice in a specific area of medicine or surgery.” 7th Cir. Dkt. 44 at 3. The Fifth Circuit agreed, stating that the “requirement that physicians performing abortions must have hospital admitting privileges helps to ensure that credentialing of physicians beyond initial licensing and periodic license renewal occurs.” Abbott I, 784 F.3d at 411.

Hi. Accountability and peer review

Finally, in addition to Wisconsin’s experts and Dr. Bulun, plaintiffs’ own expert witness, Dr. Douglas W. Laube, a Professor of Obstetrics and Gynecology at the University of Wisconsin Medical School, and past president of the American College of Obstetricians and Gynecologists, testified that accountability and peer review was a benefit to women’s health promoted by Wisconsin’s admitting-privileges requirement. Dkt. 244 at 65-66.[6]
Ill
A. Wisconsin’s admitting-privileges requirement does not impose an Undue Burden on a woman’s ability to choose abortion.
The record evidence I have cited establishes beyond a doubt that the Wisconsin State Assembly had a “rational basis to act” in passing this admitting-privileges law in order to protect the health and safety of pregnant women who choose abortion in Wisconsin. See Gonzales, 550 U.S. at 158, 127 S.Ct. 1610. Given that “Regulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden,” Casey, 505 U.S. at 877-78, 112 S.Ct. 2791, the next question is whether this law has the effect of imposing an undue burden on the ability of women to choose abortion.
The Casey plurality first described the “undue burden” test as follows: “A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.” Id at 877, 112 S.Ct. 2791. We said that, in application, “a court’s proper focus must be on the practical impact of the challenged regulation and whether it will have the likely effect of preventing a significant number of women for whom the regulation is relevant from obtaining abortions.” Karlin, 188 F.3d at 481. The Supreme Court then simplified Casey’s description of an undue burden by collapsing the purpose inquiry into the effects test. See Gonzales, 550 *931 U.S. at 158, 127 S.Ct. 1610; Currier, 760 F.3d at 460 n. 4 (Garza, J., dissenting). That is the second step of our analysis.
As an intermediate appellate court, we are bound to apply standards established by the Supreme Court. When this case was-first before us, however, the court majority shifted the burden to the state to justify the medical necessity of its admitting-privileges law and characterized the undue burden standard for the district court to apply on remand as follows:
The cases that deal with abortion-related statutes sought to be justified on medical grounds require not only evidence (here lacking as we have seen) that the medical grounds are legitimate but also that the statute not impose- an “undue burden” on women seeking abortions. The feebler the medical grounds, the likelier the burden, even if slight, to be “undue” in the sense of disproportionate or gratuitous.
Van Hollen, 738 F.3d at 798 (citations omitted). Although I concurred in that judgment affirming the preliminary injunction because the law provided no grace period for abortion doctors to acquire admitting privileges before the law requiring them took effect, I did not then — nor do I today — endorse the home-brewed “undue burden” standard that the court now doubles-down on. Simply stated, it finds no basis in Gonzales, Casey, or any other case law other than that which it created. See Whole Women’s Health v. Lakey, 769 F.3d 285, 297 (5th Cir.2014) (“Under our precedent, we have no authority by which to turn rational basis into strict scrutiny under the guise of the undue burden inquiry.”). By reversing the burdens of proof, the court also implicitly rejects Mazurek, 520 U.S. at 971, 117 S.Ct. 1865, which requires that the party challenging an abortion restriction bear the burden of proof. See Abbott II, 748 F.3d at 597.
1. Effect of AMS’s potential closure on the Undue Burden analysis
In Wisconsin, Planned Parenthood operates abortion clinics in Milwaukee, Madison, and Appleton. Its abortion providers at each of those clinics have secured admitting privileges. Affiliated Medical Services (AMS) operates one abortion clinic in Milwaukee. Drs. Dennis Christensen and Bernard Smith staff AMS and are, at present, the only abortion providers in Wisconsin to conduct abortions after 18.6 weeks LMP (commonly known as “late-term abortions”). Neither has secured admitting privileges. Consequently, the plaintiffs contend that AMS risks closure, and that, if that occurs, women seeking abortions in Wisconsin will face three undue burdens: (1) significantly increased wait times; (2) required travel to Chicago or other locations; and (3) no inpatient option for women seeking late-term abortions in Wisconsin. I address these arguments in turn.
a. Wait times
Dr. King of Planned Parenthood testified that, if AMS were to close, it would “overwhelm the capacity of the Planned Parenthood of Wisconsin clinics to accommodate” the 2,500 women who incurred abortions at AMS in 2013. Dkt. 243 at 147-48. In crediting this testimony, the district court erroneously characterized the undue burden standard as requiring “access to abortion services in Wisconsin.” Van Hollen, 94 F.Supp.3d at 989. The Supreme Court’s abortion jurisprudence carries no intrastate guarantee.
“Although all pre-viability regulations burden a woman’s ability to obtain an abortion to some degree, the Court [in Casey ] explained that an abortion law is not rendered unconstitutional merely because it operates to make it more difficult *932 or more expensive to procure an abortion.” Karlin, 188 F.3d at 479 (citing Casey, 505 U.S. at 874, 112 S.Ct. 2791). Casey rejected the notion that the abortion right is the right “to decide whether to have an abortion without interference from the State.” Casey, 505 U.S. at 875, 112 S.Ct. 2791 (quoting Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 61, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)) (internal marks omitted). Rather, the abortion right recognized by Roe is the “right to be free from unwarranted governmental intrusion” in making the abortion decision. Id. (citation and internal marks omitted). Ultimately, Casey summarizes the undue burden standard as follows:
Only where state regulation imposes an undue burden on a woman’s ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.
Id. 505 U.S. at 874, 112 S.Ct. 2791 (citations omitted).
The Supreme Court has held that the constitutional right to privacy extends to a woman’s right to choose abortion; it has not held, or even implied, that this right is intrastate in nature. To be sure, there is-no constitutional right to obtain an abortion at the clinic of one’s choice and at the time of one’s convenience, just as one’s right to free speech does not apply in all places a protester might desire to complain. In the same way that a state may reasonably regulate speech if it leaves open adequate alternative forums for expression, increased wait times at one clinic do not constitute an undue burden when other clinics within a reasonable distance remain open for business. See, e.g., Abbott II, 748 F.3d at 598 (clinic closure was not undue burden when another clinic was accessible within 150 miles); Women’s Med. Prof. Corp. v. Baird, 438 F.3d 595, 605 (6th Cir.2006) (same within 45 to 55 miles); Greenville Women’s Clinic v. Bryant, 222 F.3d 157, 165 (4th Cir.2000) (same within 70 miles).
AMS is one of four abortion clinics in Wisconsin and two in Milwaukee. Even if it closed, patrons seeking pre-18.6 week LMP abortions (approximately 98% of women seeking abortions in Wisconsin) would need to travel a mere 1.3 miles (four minutes by automobile) to reach Planned Parenthood’s Milwaukee clinic instead.[7]
The plaintiffs argue that the state creates an undue burden under Casey when a regulation designed to protect the health and safety of pregnant women decreases the availability of qualified abortionists. The implications of this argument are astounding. Taken to its logical end, this argument would require the state to assume some affirmative duty both to provide abortion services and to do so in a manner that is convenient for consumers of abortion and with no regard for the quality of healthcare professionals that a state’s naturally occurring marketplace provides. The state bears no such obligation or duty. Karlin, 188 F.3d at 479 (“Although all pre-viability regulations burden a woman’s ability to obtain an abortion to some degree, the Court explained [in Casey ] that an abortion law is not rendered unconstitutional merely be *933 cause it operates to make it more difficult or more expensive to procure an abortion.”) (citation omitted).
While the Supreme Court has limited a state’s ability to regulate abortions, it has never required a state to establish a command economy in order to provide them. That the market may disfavor abortionists is not the state’s concern, but the prerogative of the purveyors of that service. Like any enterprise that wishes to be a going concern, entities that wish to sell abortions must hire practitioners who are able to secure the necessary credentials on the basis of their professional reputations and their documented provision of skilled care.[8] In this instance, these credentials include admitting privileges.
The solution to the plaintiffs’ problems is that they find more qualified doctors, not that the state relax — or that we strike down as unconstitutional — precautions taken by the state to protect the health and safety of pregnant women who have chosen to abort their pregnancies. See Casey, 505 U.S. at 875, 112 S.Ct. 2791 (rejecting the notion that the abortion right is the right “to decide whether to have an abortion without interference from the State”). Lest there be any doubt, Wisconsin labors under no compulsory receivership that obligates it to intervene if the market fails to provide qualified abortionists within its boundaries. State inaction is not state action.
In short, there is simply no basis for us to disrupt the market for abortionists by interjecting ourselves: their abilities to qualify for admitting privileges, like “[t]he independent decisions of private hospitals!,] have no place in our review of state action under the Constitution.” Currier, 760 F.3d at 460 (Garza, J., dissenting) (citation and footnote omitted).
b. Required travel and availability of late-term abortions
Consumers who live near the border of two states tend to shop at the closest destination, regardless of whether they reside in that state. Disregarding this routine assumption, plaintiffs argue that requiring women seeking abortion to travel outside the state to obtain late-term abortions creates an undue burden. Surprisingly, this argument finds some basis in the Fifth Circuit’s recent decision in Jackson Women’s Health Organization v. Currier, 760 F.3d 448, 457 (5th Cir.2014), where the court held that “the proper formulation of the undue burden analysis focuses solely on the effects within the regulating state.” However, our precedent squarely disagrees with Jackson: “the undue-burden standard must be applied ... *934 to the nation as a whole, rather than one state at a time.” A Woman’s Choice-E. Side Women’s Clinic v. Newman, 305 F.3d 684, 688 (7th Cir.2002).
Turning towards distance rather than towards the governor’s mansion, Chicago is approximately 93 miles from Milwaukee — or a one hour and forty minute drive. The Fifth Circuit recently held that Texas’s admitting-privileges law did not impose an undue burden on a woman’s right to choose abortion because “travel of less than 150 miles for some women is not an undue burden under Casey.” Abbott II, 748 F.3d at 598 (citation omitted). Before Abbott II, the Sixth Circuit similarly concluded that there was no undue burden under Casey where one of two Ohio clinics to conduct 18-24 week abortions was closed due to lack of a transfer agreement with a local hospital, even when the remaining clinic was located over 200 miles away. See Baird, 438 F.3d at 599, 605. Consistent with these authorities, it is well within the scope of Newman to conclude that the 93-mile trip from Milwaukee to Chicago to obtain an abortion does not impose an undue burden on a woman’s ability to choose abortion. 305 F.3d at 688.
2. Even if the undue burden standard applied to the market availability of abortion doctors, the AMS abortionists made minimal efforts to obtain admitting privileges.
When this case was before us on the preliminary injunction, I asked plaintiffs’ counsel at oral argument about the status of the plaintiffs’ applications for admitting privileges at Wisconsin hospitals. Counsel was unable to confirm whether any doctors servicing the four abortion clinics in Wisconsin possessed admitting privileges, nor did she know the status of any pending applications by her clients to obtain them.[9]

i. Planned Parenthood’s efforts to obtain admitting privileges

We know more now. At least six Planned Parenthood abortion doctors — Dr. Susan Pfleger, Dr. Kathy King, and pseudonymous plaintiffs PI, P2, P3, and P5 — all of whom did not have admitting privileges when this lawsuit was filed, have subsequently obtained them. See Van Hollen, 94 F.Supp.3d at 988-89. These individuals put forth sufficient efforts to obtain admitting privileges and were successful, proving that obtaining admitting privileges is not an insurmountable obstacle, even for abortion doctors.

ii. AMS’s efforts to obtain admitting privileges

The same cannot be said of Drs. Christensen and Smith. Milwaukee has over two dozen hospitals,[10] yet Dr. Smith only attempted to apply for admitting privileges at one hospital (and had the AMS manager send an inquiry email to another). Dr. Christensen (who had admitting privileges for decades before entering semi-retirement) attempted to apply for admitting privileges at two hospitals, but did not attempt to satisfy their informational requests. In the words of the district court, these “efforts” demonstrate that both doc *935 tors “fail[ed] to exhaust all opportunities” to obtain admitting privileges. Id. at 987. I agree with that assessment. Moreover, while both doctors were savvy enough to obtain counsel for the purpose of initiating this lawsuit, neither did so to assist in their acquisition of the admitting privileges this lawsuit seeks to invalidate. Dkt. 211 at 48 (Dr. Smith); Dkt. 226 at 45 (Dr. Christensen). Despite plaintiffs’ arguments to the contrary, indifference towards the law by abortion providers that results in an abortion clinic’s potential closure does not create an undue burden.
IV
I regret that today’s decision marks the latest chapter in our circuit’s continued misapplication of the Supreme Court’s abortion jurisprudence. By a majority of one, the court has eliminated a measure that Wisconsin’s elected officials have enacted to protect the health and safety of women who choose to incur an abortion. There is no question that Wisconsin’s admitting-privileges requirement furthers the legitimate, rational basis of protecting women’s health and welfare. Among other benefits, the requirement promotes continuity of care and helps to ensure that abortionists are properly credentialed and qualified. It also works in tandem with Wisconsin’s ultrasound requirement to facilitate informed decision-making on the parts of doctor and patient alike. Nor is there any indication that the requirement would pose a substantial obstacle to women’s ability to access abortion providers in their area. As Planned Parenthood’s successful applications for admitting privileges demonstrate, the hospitals of Wisconsin are perfectly willing to grant admitting privileges to qualified physicians who perform abortions in their state. Because Wisconsin’s admitting-privileges requirement has the rational basis of promoting the health and safety of pregnant women who have decided to incur an abortion, and because it does not impose an undue burden under Casey, I dissent.

. See Dkt. 198 ¶ 11. The record also reveals that, during that period, at least four patients who received abortions at those clinics were transferred from the clinics to a hospital by ambulance for abortion-related complications, and four women reported that they had post-abortion infections that resulted in treatment at a hospital. Id. ¶¶ 12-13. Additionally, between 2009 and 2014, at least eight AMS abortion patients were transferred directly from AMS’s abortion clinic to a hospital to treat serious complications from an abortion procedure performed by one of AMS’s physicians. Id. ¶ 26. During that same time period, at least three AMS abortion patients suffered complications serious enough that a hysterectomy was required, resulting in those patients no longer being able to bear children. Id. ¶ 27.

. In its efforts to wrest this case from the ambit of rational basis review, the court assigns great weight to numerous studies and reports which 'contend that complications rarely occur after abortions and that those which do occur are not more frequent than other types of outpatient surgeries. But this is immaterial because courts do not weigh evidence when they apply rational basis review. See Nat'l Paint & Coatings Ass’n v. City of Chic., 45 F.3d 1124, 1127 (7th Cir.1995) (recalling that there is "never a role for evi-dentiary proceedings” under rational basis review). For the plaintiffs to prevail, they must prove that post-abortion complications never occur in Wisconsin, or that admitting privileges have no impact on safety. See Heller, 509 U.S. at 321, 113 S.Ct. 2637 ("[T]he burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it.”) (citation and internal marks omitted). However, that is not possible on this record, because the plaintiffs’ own expert and the court-appointed expert testified that admitting privileges are beneficial because they make abortion safer.

. See American College of Surgeons, Statement on Patient Safety Principles for Office-based Surgery Utilizing Moderate Sedation/Analgesia, Deep Sedation!Analgesia, or General Anesthesia, Bulletin of the American College of Surgeons, Vol. 89, No. 4 (Apr.2004), available at http://www.facs.org/fellows_info/ statements/st-46.html (last visited Nov. 12, 2015).

. The district court presupposed that the lack of required admitting privileges for other, more dangerous medical procedures showed that the only purpose of Wisconsin's law was to restrict safe, legal abortions. It also con-eluded that the immediate effective date after signing was clearly intended to close the clinics. But the legislative purpose was not to immediately close the clinics. The legislature approved the statutes several weeks before the governor signed the legislation. There is no evidence that their apparent failure to designate a specific effective date was anything other than a simple oversight. The preliminary injunction, with which I concurred, quickly cured that problem. Significantly, the preliminary injunction and the delay in connection with the trial enabled all of Planned Parenthood’s abortion doctors to acquire admitting privileges.

. In its standing analysis, the court correctly recognizes that a woman who has had or is expecting to have an abortion does not want her name exposed as a plaintiff in a lawsuit challenging the constitutionality of the law regulating abortion practices. The same privacy concerns would be encountered if a woman suffering from an abortion-related injury had to go to the nearest emergency room. There she would have to give her name and disclose the cause of her injury (or else lie about it, suggesting that it must have been a natural miscarriage). She may also have to wait in line before being treated, or undergo preliminary examinations to determine the nature and source of the problem. If admitting privileges were in place, by contrast, the woman's operating physician could bypass any embarrassing delay and promptly secure the woman’s admission and treatment upon arrival. In this way, the physician-to-physician communication facilitated by the admitting-privileges requirement would help protect the woman's privacy and promote more efficient remedial treatment.

. While the only issue on appeal is the mandate for admitting privileges, another very important purpose of Wisconsin’s law was the requirement for ultrasounds. As I pointed out in my earlier concurrence, receiving an ultrasound before an abortion benefits women in several ways. For starters, the ultrasound would confirm the fact that she was pregnant. Once she saw or heard the heartbeat, she would be assured that there is not a mistaken pregnancy test or a spontaneous miscarriage that was not earlier detected. Thus she would avoid paying several hundred dollars for an unnecessary operation. Also, the ultrasound would help reduce medical uncertainty and disclose any potential complications, such as by enabling a more accurate assessment of the gestational stage of the pregnancy. The detection of twins might also give the woman second thoughts. But regardless of whether certain legislators hoped that an ultrasound would cause the woman to change her mind, the ultrasound indisputably provides important information facilitating a more fully informed decision, which cannot be seen as anything but a benefit to the woman (even if the abortionist might disapprove of her decision). The obvious benefits flowing from the ultrasound requirement show that Wisconsin's law is supported by a number of rational bases — all centered on the health and welfare of the woman — in addition to those advanced by the requirement for admitting privileges.

. Statistics indicate that approximately 98% of women seeking abortions in Milwaukee will not be impacted if AMS closes. In 2012, there were 6,927 abortions reported in Wisconsin. Dkt. 200 ¶ 9. That same year, AMS performed 131 post-20 week LMP abortions. Dkt. 243 at 29-30. Although these statistics do not account for the women who incurred abortions after 18.6 weeks LMP, but before 20 weeks LMP, the post-20 week number accounts for less than 2% of all abortions-in Wisconsin. Women seeking the latest term abortions permitted by law have access to other clinics in Chicago that are well within a distance held not to be an undue burden, as I discuss below.

. The court refers to a few hospitals that require doctors to have treated a certain number of patients there in order to obtain admitting privileges. Other hospitals might give admitting privileges to doctors who demonstrate competence in the particular procedure that the doctor seeks to perform. Of course, a hospital that requires delivering 100 live babies in the previous two years would not give the AMS doctors admitting privileges because, as the court observes, "delivering live babies is not what abortion doctors do.” And as the court also noted when discussing the very low death rate for women who undergo abortions, the study cited measured long-term mortality rates "rather than death resulting from an abortion.” However, to their credit, the Planned Parenthood doctors at the other three abortion clinics in Wisconsin have apparently demonstrated sufficient competence in medical procedures, perhaps even delivering live babies, to qualify for and to obtain the statutorily required admitting privileges. For women considering abortion, that credential that distinguishes them from AMS is worth noting. Although the court implies otherwise, it is safe to say that the Planned Parenthood doctors will not depend on the "rare” abortion complication to obtain a sufficient volume of hospital work to maintain their admitting privileges.

. Of course, I recognize that, at the preliminary injunction stage, it was in counsel's clients’ best interests for her to be non-responsive to my question because if she had informed us that some of her clients already possessed admitting privileges, some of the clinics would likely have remained open even in light of the law’s immediate effect, and we may have been less likely to affirm the injunction entered by the district court.

. See Discover Milwaukee-Metro Milwaukee Hospitals, http://www.discovermilwaukee. com/healthcare-and-fitness/metro-milwaukee-hospitals/ (last visited Nov. 12, 2015).